# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | ) No. 68057-9-I |
| | ) |
| Respondent, | ) DIVISION ONE |
| | ) |
| v. | ) PUBLISHED OPINION |
| | ) |
| JOSE MANUEL CARDENAS-MURATALLA, | ) |
| AKA JOSE MANUEL CARDENAS-MURALTA, | ) |
| | ) FILED: February 3, 2014 |
| Appellant. | ) |

GROSSE, J. — To be valid under both state and federal law, a warrantless, investigatory stop, or Terry[1] stop, must be reasonable, and it is the State's burden to prove reasonableness. An investigatory stop is reasonable if the arresting officer can testify to specific and objective facts that provide a reasonable suspicion that the person stopped has committed or is about to commit a crime. In determining whether an investigatory stop and frisk is reasonable, courts look at the totality of the circumstances. The circumstances must suggest a substantial possibility that the particular person has committed a specific crime or is about to do so. Here, an anonymous tip reporting conduct not constituting a crime did not suffice to justify a Terry stop. Accordingly, we reverse.

## FACTS

At about 9:45 p.m. on December 7, 2010, Seattle Police Department Officers Christopher Myers and Chriseley Lang handled a nuisance call near Second Avenue and Main Street in Seattle. As the officers were completing the call, they heard a broadcast of a 911 call of a man with a gun in the area of Third

---

[1] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

Avenue and Yesler Way. At that time of night, that area is "an extremely high drug area, high weapons area, and high crime area." The broadcast did not give the identity of the person who reported seeing the man with the gun, but described the suspect as a Hispanic male wearing a light blue hoodie and described the gun as having a silver handle. The caller reported the suspect displayed the gun; the caller did not say that the suspect pointed the gun at anybody or threatened anybody. The officers never learned the identity of the 911 caller.

Traveling along Third Avenue, the officers saw a person who matched the description of the suspect. Officer Myers testified that the suspect, later identified as appellant Jose Cardenas-Muratalla, looked surprised to see a patrol car, straightened his posture, had an "oh, crap" look on his face, and began "fluffing" behavior. Fluffing is when a person grabs the front of his or her sweatshirt and pulls it down and away from his or her body. Officer Myers testified that by fluffing, a person is "telegraphing that he has something to hide" and "telegraphing . . . that it is right there in the front waistband." Another reason for fluffing is to make sure the gun is not tangled up in clothing and is accessible.

Officer Myers made a hard left turn to bring the patrol car across two lanes of traffic and shined the spotlight on Cardenas-Muratalla. At the time, Cardenas-Muratalla was holding a cell phone to his head with his right hand. The officer got out of the car, drew his handgun, and yelled at Cardenas-Muratalla, who had started to walk away, to get down on the ground. Cardenas-Muratalla did not comply with the officer's instruction.

2

Officer Lang's testimony differed from Officer Myers' testimony. Officer Lang testified that she had a clear view of Cardenas-Muratalla and that when the officers spotted him, he was not doing anything suspicious with his hands and was not doing anything with his hands, body, or expression that raised her level of alarm. The officer testified that her suspicions were aroused only when Cardenas-Muratalla began to "shuffle" away and did not respond to Officer Myers' direction to stop. She testified that Cardenas-Muratalla was talking on a cell phone as the officers approached and was still talking on the phone when he shuffled away.

Officer Lang got out of the patrol car, went northbound on Third Avenue, and blocked Cardenas-Muratalla's avenue of escape. She had her handgun pointed at Cardenas-Muratalla as he walked toward her.

Officer Myers watched Cardenas-Muratalla heading northbound. Officer Myers testified that Cardenas-Muratalla began to walk more quickly and that his arm was pinned against his side. This behavior indicated to the officer that Cardenas-Muratalla was attempting to hold something in place and also that he was getting ready to break into a run. Officer Myers returned his gun to his holster and drew his taser. He discharged the taser, discarded it, and drew his handgun again.

The taser hit Cardenas-Muratalla's left arm. After he had been hit, Cardenas-Muratalla turned around and headed away from Officer Lang and toward Officer Myers. As he walked, Cardenas-Muratalla kept his right hand down by his side, which Officer Myers thought was an attempt to pull a gun out of

his clothing. Officer Myers shot Cardenas-Muratalla and he fell to the ground and was handcuffed. Officer Myers recovered a handgun from Cardenas-Muratalla's front waistband. The gun was black, not silver as the 911 caller had described, and was not loaded.

Cardenas-Muratalla, who had a prior conviction for conspiracy to deliver heroin, was charged with first degree unlawful possession of a firearm. Prior to trial, Cardenas-Muratalla moved to suppress the gun the officers recovered from his waistband. After a hearing, the trial court denied the motion. The matter went to trial and Cardenas-Muratalla was convicted as charged.

## ANALYSIS

On appeal, Cardenas-Muratalla challenges the trial court's denial of his motion to suppress the gun. We review findings of fact on a motion to suppress for substantial evidence and review the suppression order's conclusions of law de novo.[2]

It is well established that a police officer does not need a warrant to conduct a Terry stop if it is based on "specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion of criminal activity.[3] The officer must have some suspicion of a particular crime or a particular person, and some connection between the two.[4] We have repeatedly stated that "articulable reasons" or "particularized suspicion" of criminal activity must be based on the police officer's assessment of the totality

---

[2] State v. Duncan, 146 Wn.2d 166, 171, 43 P.3d 513 (2002).
[3] Terry, 392 U.S. at 21.
[4] State v. Martinez, 135 Wn. App. 174, 180, 143 P.3d 855 (2006).

of circumstances with which he is faced.[5] The officer's assessment must be such that in the officer's experience and knowledge, together with rational inferences drawn from those facts, reasonably warrant the limited intrusion upon an individual's freedom.[6] The totality of circumstances test of Illinois v. Gates[7] has replaced the two-pronged test of Aguilar-Spinelli[8] in evaluating reasonable articulable suspicion taking into consideration both the quality and quantity of information known to the police.[9] Under the "total circumstances" test, we consider "the particular circumstances facing the law enforcement officer" including the seriousness of the offense and any threat to public safety.[10] The presence of a firearm in public alone is insufficient for an investigatory stop,[11] but a report of actual or threatened use of a firearm can present a significant risk to public safety supporting an investigatory stop.[12]

---

[5] State v. Marcum, 149 Wn. App. 894, 205 P.3d 969 (2009); State v. Randall, 73 Wn. App. 225, 228, 868 P.2d 207 (1994).

[6] Terry, 392 U.S. at 21.

[7] 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983).

[8] Aguilar v. Texas, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969).

[9] Randall, 73 Wn. App. at 228.

[10] State v. Lesnick, 84 Wn.2d 940, 944, 530 P.2d 243 (1975) ("[N]o single rule can be fashioned to meet every conceivable confrontation between police and citizen. . . . [E]ach case must be considered in light of the particular circumstances facing the law enforcement officer. In this case, the suspected crime . . . posed no threat of physical violence or harm to society or the officers."); State v. Franklin, 41 Wn. App. 409, 412-13, 704 P.2d 666 (1985) ("[C]ourts have recognized the need for an immediate investigatory stop when an anonymous informant of undetermined reliability states that he or she observed a suspect carrying or displaying a gun in a public place.").

[11] Florida v. J.L., 529 U.S. 266, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000).

[12] See generally State v Wakeley, 29 Wn. App. 238, 242, 628 P.2d 835 (1981) (pre-J.L. decision upholding investigatory stop based on three individuals' phone reports that they heard three gunshots; "[t]he officers' decision to adopt an immediate response was reasonable because crimes involving firearms present

Officers investigating reports of emergent risks of imminent violence do not have the opportunity to make detailed inquiries to establish the veracity or

a serious threat of physical injury."); Franklin, 41 Wn. App. at 412-13 (pre-J.L. decision "courts have recognized the need for an immediate investigatory stop when an anonymous informant of undetermined reliability states that he or she observed a suspect carrying or displaying a gun in a public place").

See also 4 W. LaFave, Search and Seizure § 9.5(i), at n.543 (2013): Robinson v. Howes, 663 F.3d 819 (6th Cir. 2011); United States v. Gomez, 623 F.3d 265[, 267, 270] (5th Cir. 2010) (assuming the informant was only an "anonymous tipster," caller "was not reporting a concealed weapon" but rather [sic] described person was "brandishing" a pistol and was "threatening individuals"); United States v. Hampton, 585 F.3d 1033[, 1038] (7th Cir. 2009) ("Smith and other callers reported multiple gunshots fired in broad daylight and a gunman on the loose"; "J.L. does not apply to emergency situations, so because we conclude that Smith's call reported an ongoing emergency, J.L. does not help Hampton."); United States v. Simmons, 560 F.3d 98[, 105] (2d Cir. 2009) ("that an anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges generally criminality"); United States v. Wooden, 551 F.3d 647[, 650] (7th Cir. 2008) (where anonymous 911 caller reported an armed domestic quarrel and said he saw defendant draw a gun from holster, provided grounds for an investigatory stop; there was "a need for dispatch" even though the scene was calm when police arrived); United States v. Whitaker, 546 F.3d 902[, 909] (7th Cir. 2008) (police responding to a 911 call regarding "an ongoing altercation," involving defendant threatening another with a gun; cases in accord collected); United States v. Hicks, 531 F.3d 555[, 560] (7th Cir. 2008) (collecting other cases caller "gave the 911 operator enough information to identify him and his location, and because he reported an ongoing emergency," namely that armed man was presently beating a woman); United States v. Elston, 479 F.3d 314[, 318-19] (4th Cir. 2007) (the informant "was reporting an imminent threat to public safety—an individual who had expressly threatened to shoot someone in the very near future," as "emergency"; anonymous report here "bore strong indicia of reliability" because of "wealth of detail" based on "her contemporaneous personal observation"); People v. Dolly, 40 Cal. 4th 458, [461, 465, 469,] 53 Cal. Rptr. 3d 803, 150 P.3d 693 (2007) ("an anonymous 911 tip contemporaneously reporting an assault with a firearm and accurately describing the perpetrator, his vehicle, and its location is likewise sufficient to justify an investigatory detention," as that "defendant's conduct in pointing a revolver at the caller in an apparent threat to shoot him posed a grave and immediate risk not only to the caller but also to anyone nearby," and "the caller supplied a plausible explanation for wanting to remain anonymous").

vantage point of individuals reporting suspicious activity.[13] An informant's tip alone may provide the necessary reasonable suspicion to justify an investigatory stop. But, in order to do so, the tip must at least be reliable. In Florida v. J.L.,[14] the United States Supreme Court held that an anonymous tip that a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person. In that case, an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. Nothing was known about the informant. Two officers went to the bus stop and saw three black males standing there. One of the three males was wearing a plaid shirt. Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The male in the plaid shirt made no threatening or other unusual movements. One of the officers frisked the male and seized a gun from his pocket.

The Court stated that an anonymous tip, standing alone, seldom demonstrates the informant's basis of knowledge or reliability. If suitably corroborated, however, the tip can have sufficient indicia of reliability to provide an officer with reasonable suspicion to make an investigatory stop.[15] In the case before it, the Court held that the tip was not reliable:

> The reasonableness of official suspicion must be measured by
> what the officers knew before they conducted their search. All the

---

[13] Randall, 73 Wn. App. at 230 ("An officer acting on a tip involving the threat of violence and rapidly developing events does not have the opportunity to undertake a methodical, measured inquiry into whether the tip is reliable.").
[14] 529 U.S. 266, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000).
[15] See Alabama v. White, 496 U.S. 325, 331-32, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990) (holding Terry stop justified where an anonymous tip contained both innocent details and predictive information that was corroborated).

police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant].[16]

The Court stated that an informant's accurate description of a subject's readily observable location and appearance is reliable in that it can help the police correctly identify the person about whom the informant is speaking. Such a tip does not, however, "show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."[17]

Similarly, in State v. Gatewood,[18] two officers in a marked patrol car were driving on Rainier Avenue South shortly after midnight and spotted three or four people, including Gatewood, sitting in a bus shelter. One of the officers testified that Gatewood's eyes got big and he looked surprised to see the patrol car and that he twisted his body to the left as if trying to hide something. The officers decided to circle back to the bus shelter to investigate. By the time they got back to the bus shelter, Gatewood had left and was walking down the street. He jaywalked, turned onto another street, and continued walking. One of the officers told Gatewood to stop because he wanted to talk to him. Gatewood turned around, walked away, and ignored the officer's repeated order to stop. Gatewood walked to some bushes, bent over, pulled something out of his waistband and threw it into the bushes, and then complied with the officer's

---

[16] J.L., 529 U.S. at 271.
[17] J.L., 529 U.S. at 272.
[18] 163 Wn.2d 534, 182 P.3d 426 (2008).

request to stop. One officer handcuffed Gatewood and the other recovered a handgun in the bushes. The officers found marijuana on Gatewood's person, and a search of the bus stop yielded cocaine.

The Supreme Court held that the officers were not justified in making the Terry stop. The officers' actions had to be justified at the time they made the stop which, in the case before the court, was when the officer told Gatewood to stop so he could talk to him. At that point, the facts known to the officers were: Gatewood's widened eyes when he saw the patrol car, his twisting as if to hide something, his departure from the bus shelter, and his jaywalking. The court held that these facts were insufficient for a Terry stop because a startled reaction to seeing a patrol car does not amount to reasonable suspicion, the officers did not see what, if anything, Gatewood was trying to hide when he twisted around, and Gatewood did not "flee" from the police simply because he walked away from the bus stop. The court concluded that although it was proper to circle back and investigate further, the officers' seizure of Gatewood was premature and not based on specific, articulable facts indicating criminal activity.[19] These are essentially the facts in the instant matter.

Here, neither the informant nor the informant's tip was reliable. The officers knew nothing about the 911 caller. The caller did not give his name, and the 911 operator was unable to reach the caller on a call-back. Further, the tip was not the report of any criminal activity. The informant said Cardenas-Muratalla showed him his gun, but that he (the informant) did not feel threatened.

---

[19] Gatewood, 163 Wn.2d at 540-42.

9

Carrying a firearm is a crime if it is carried or displayed in a manner that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons,[20] or if it is willfully discharged in a place where there is a reasonable likelihood that humans, domestic animals, or property will be jeopardized.[21] There is no evidence in the record that the 911 caller reported being intimidated or alarmed when the suspect showed him the gun or that the suspect discharged the gun or pointed it at anyone. In fact, the caller told the 911 operator, "He didn't threaten me. It's just that he showed me. I seen it. . . . Just calling to tell you, just calling to tell you." That is the only evidence in the record about the emotional state of the 911 caller or about Cardenas-Muratalla's actions that prompted the 911 call. The tip did not provide information raising a reasonable suspicion of criminal activity. Moreover, the unreliable informant's tip was not corroborated by any observations by the officers of suspected criminal activity. Cardenas-Muratalla's presence in a high crime area at night, looking startled upon seeing the patrol car, and walking away from the doorway while talking on a cell phone do not justify a stop. Although Officer Myers claimed that Cardenas-Muratalla "fluffed" his sweatshirt when he saw the officers, this claim not only contradicts Officer Lang's testimony but also is not supported by the video evidence in the record. Under the totality of the circumstances, the Terry stop in this case was not reasonable. The trial court's findings of fact on Cardenas-Muratalla's motion to suppress the gun are not supported by

---

[20] RCW 9.41.270; see also RCW 9A.36.011, .021 (assault).
[21] SEATTLE MUNICIPAL CODE 12A.14.071.

10

substantial evidence. The trial court erred in denying the motion.[22] Because the gun was the basis for Cardenas-Muratalla's prosecution, his conviction of unlawful possession of a firearm must be reversed.

Reversed.

WE CONCUR:

---

[22] We reject the State's argument that the officers had probable cause to arrest Cardenas-Muratalla for assault or attempted assault. The trial court specifically stated that it could not determine whether Cardenas-Muratalla intended to draw a weapon. Based on the evidence in the record, we agree with the trial court.