IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  35305-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | OPINION PUBLISHED |
| ISMAEL M. TARANGO, | ) | IN PART |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — At issue in this appeal is whether a reliable informant's tip that Ismael Tarango was seen openly holding a handgun while seated in a vehicle in a grocery store parking lot was a sufficient basis, without more, for conducting a *Terry*[1] stop of the vehicle after it left the lot.  In the published portion of this opinion, we hold that it was not, and that Mr. Tarango's motion to suppress the evidence obtained as a result of the stop should have been granted.

In the unpublished portion of this opinion, we hold that the evidence at trial was insufficient to establish his unlawful possession of a second firearm located in the vehicle after it was stopped.  We reverse his firearm possession convictions and remand for proceedings consistent with this opinion.

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

FACTS AND PROCEDURAL BACKGROUND

At around 2:00 in the afternoon on a winter day in 2016, Carlos Matthews drove to a neighborhood grocery store in Spokane, parking his car next to a Chevrolet Suburban in which music was playing loudly. A man was sitting in the passenger seat of the Suburban, next to its female driver. When Mr. Matthews stepped out of his car and got a better look at the passenger, who turned out to be Ismael Tarango, he noticed that Mr. Tarango was holding a gun in his right hand, resting it on his thigh. Mr. Matthews would later describe it as a semiautomatic, Glock-style gun.

As he headed into the store, Mr. Matthews called 911 to report what he had seen, providing the 911 operator with his name and telephone number. No recording or transcript of the 911 call is in the record, but a computer-aided dispatch (CAD) report offered by Mr. Tarango in support of a later motion to suppress included the following entries:

| /142038 | (25) | ENTRY | MALE WITH A HANDGUN IS SITTING IN HIS VEHICLE BEHIND THE BARGAIN GIANT. |
| /142140 | | SUPP | TXT: VEH BRN CHEVY TAHOE. LIC # UNK. H/M, 35 YRS. SEAHAWKS CAP AND SEAHAWKS SHIRT. HE ONLY HAD GUN IN HIS HAND HE DID NOT RAISE THE GUN OR DISPLAY IT. COMP. SAW IN MALES LAP. ### |

Clerk's Papers (CP) at 26. These entries were followed in the report by entries identifying the several officers who responded.

2

The first officer to respond saw a vehicle meeting Mr. Matthews's description parked on the east side of the store. He called in the license plate number and waited for backup to arrive. Before other officers could arrive, however, the Suburban left the parking area, traveling west.

The Suburban was followed by an officer and once several other officers reached the vicinity, they conducted a felony stop. According to one of the officers, the driver, Lacey Hutchinson, claimed to be the vehicle's owner. When told why she had been pulled over, she denied having firearms in the vehicle and gave consent to search it. After officers obtained Mr. Tarango's identification, however, they realized he was under Department of Corrections (DOC) supervision and decided to call DOC officers to perform the search.

In searching the area within reach of where Mr. Tarango had been seated, a DOC officer observed what appeared to be the grip of a firearm located behind the passenger seat, covered by a canvas bag. When the officer moved the bag to get a better view of the visible firearm—the visible firearm turned out to be a black semiautomatic—a second firearm, a revolver, fell out. Moving the bag also revealed a couple of boxes of ammunition. At that point, officers decided to terminate the search, seal the vehicle, and obtain a search warrant. A loaded Glock Model 22 and a Colt Frontier Scout revolver were recovered when the vehicle was later searched.

While others contacted DOC and remained at the scene, one of the responding officers contacted Mr. Matthews to obtain a statement as to what he had observed. Mr. Matthews told the officer that after he made the 911 call, Mr. Tarango and the female driver entered the grocery store. He told the officer that as he stood in line waiting to pay for his groceries, Mr. Tarango looked at him and raised his finger to his lips, as if signaling to Mr. Matthews to "keep quiet." Report of Proceedings (RP) (Dec. 5, 2016) at 39.

The State charged Mr. Tarango, who had prior felony convictions, with two counts of first degree unlawful possession of a firearm. Because Mr. Tarango had recently failed to report to his community custody officer as ordered, he was also charged with escape from community custody.

Before trial, Mr. Tarango moved to suppress evidence obtained as a result of the traffic stop, arguing that police lacked reasonable suspicion of criminal activity and that the search of a nonprobationer's vehicle exceeded the DOC's authority. Relying on this court's decision in *State v. Cardenas-Muratalla*, 179 Wn. App. 307, 319 P.3d 811 (2014), which had relied in turn on the United States Supreme Court's decision in *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000), Mr. Tarango argued that "it is not a crime to have a firearm in a vehicle." CP at 56.

No testimony was provided at the hearing. Mr. Tarango relied on the CAD report

4

and several police reports. The State submitted additional police and DOC officer reports.

After taking the matter under advisement, the trial court convened a hearing at which it announced its findings and denied the suppression motion. RP (Aug. 11, 2016) at 3-6. It distinguished *Cardenas-Muratalla* as involving an anonymous informant, whereas Mr. Matthews had identified himself. In finding reasonable suspicion of criminal activity, the court appeared to believe, in error, that one of Mr. Matthews's observations "known to law enforcement through his 911 call" was that while in the grocery store,

> the defendant allegedly made a gesture as if to admonish Mr. Matthews to be quiet, a shushing gesture if that's the appropriate verb or word. Matthews further described that the defendant has a weird and mean expression on his face.

RP (Aug. 11, 2016) at 4.

Written findings and conclusions were later proposed and entered, which again reflect the court's mistaken belief that Mr. Matthews saw the "shushing" gesture before making the 911 call and reported it to the 911 operator. CP at 75. The court's findings 4 and 5 state:

> 4. Informant then sees [Mr. Tarango] in the store. [Mr. Tarango] gives informant the "shushing gesture", and had a mean look on his face.
> 5. Informant then calls 911, and remains in the area to follow the vehicle and makes himself available to the police.

*Id.*

5

At the jury trial presided over before a different judge, the State called as witnesses to the firearm possession charges Mr. Matthews and the police and DOC officers who participated in the stop and the related investigation. The defense called three witnesses: Ms. Hutchinson, who testified that Mr. Tarango did not have a handgun in his possession on the day they were stopped; Vera Kay Nickerson, a friend and neighbor of Ms. Hutchinson and Mr. Tarango, who testified she placed the two firearms behind the Suburban's passenger seat, unbeknownst to Ms. Hutchinson or Mr. Tarango; and Raymond Glen Beebe, who confirmed Ms. Nickerson's testimony that he was a friend of hers, owned the Glock, and had allowed her to borrow it.

The jury found Mr. Tarango guilty as charged. He appeals.

ANALYSIS

Mr. Tarango assigns error to the trial court's denial of his suppression motion, making a related assignment of error to the court's fourth and fifth findings of fact. He also argues that insufficient evidence supports his conviction of illegal possession of the revolver recovered from the canvas bag. We address his challenges in that order.

BECAUSE OFFICERS LACKED REASONABLE SUSPICION THAT MR. TARANGO HAD ENGAGED IN OR WAS ABOUT TO ENGAGE IN CRIMINAL ACTIVITY, THE SUPPRESSION MOTION SHOULD HAVE BEEN GRANTED

We first address whether the trial court erred in denying Mr. Tarango's suppression motion. When reviewing the denial of a suppression motion, we determine whether substantial evidence supports challenged findings of fact and whether the

6

findings support the conclusions of law. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). While Mr. Tarango challenges the trial court's fourth and fifth factual findings, there is no dispute on that score; the State concedes they are in error as to timing. It agrees that officers responding to the 911 call had not heard about Mr. Matthews's report of Mr. Tarango's intimidating conduct in the grocery store, which took place after the 911 call was made. Because the only issue on appeal is whether the correct factual findings support the trial court's suppression decision, our review is de novo.

Warrantless searches and seizures are per se unreasonable unless one of the few jealously and carefully drawn exceptions to the warrant requirement applies. *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999). A *Terry* investigative stop is a well-established exception. *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008). The purpose of a *Terry* stop "'is to allow the police to make an intermediate response to a situation for which there is no probable cause to arrest but which calls for further investigation.'" *State v. Armenta*, 134 Wn.2d 1, 16, 948 P.2d 1280 (1997) (quoting *State v. Kennedy*, 107 Wn.2d 1, 17, 726 P.2d 445 (1986) (Dolliver, C.J., dissenting)).

"To conduct a valid *Terry* stop, an officer must have 'reasonable suspicion of criminal activity based on specific and articulable facts known to the officer at the inception of the stop.'" *State v. Weyand*, 188 Wn.2d 804, 811, 399 P.3d 530 (2017) (quoting *State v. Fuentes*, 183 Wn.2d 149, 158, 352 P.3d 152 (2015)). The

reasonableness of an officer's suspicion is evaluated based on the totality of the

circumstances known to the officer. *Id.* The totality of the circumstances includes the

officer's training and experience, the location of the stop, the time of day, the conduct of

the person detained, the purpose of the stop, and the amount of physical intrusion on the

suspect's liberty. *Id.* at 811-12; *State v. Mendez*, 137 Wn.2d 208, 219 n.4, 970 P.2d 722

(1999), *abrogated on other grounds by Brendlin v. California*, 551 U.S. 249, 127 S. Ct.

2400, 168 L. Ed. 2d 132 (2007).

A suspect's activity that is consistent with noncriminal activity as well as criminal

activity may still justify a brief detention under *Terry*. *Kennedy*, 107 Wn.2d at 6. The

question for the officer and for a reviewing court is whether the circumstances support a

reasonable suspicion that there is a "substantial possibility that criminal conduct has

occurred or is about to occur." *Id.*

In evaluating whether the circumstances supported a reasonable suspicion of

criminal conduct, we bear in mind that Washington is an "open carry" state, meaning that

it is legal in Washington to carry an unconcealed firearm unless the circumstances

manifest an intent to intimidate another or warrant alarm for the safety of other persons.

RCW 9.41.050, .270; S. COMM. ON LAW AND JUSTICE, WASHINGTON FIREARMS LAWS

SUMMARY 2018, at 12 (Wash. 2018), http://leg.wa.gov/Senate/Committees/LAW

/Documents/Washington%20Firearms%20Laws.pdf [https://perma.cc/M8QJ-QNUJ].

Apart from the right to carry, legal restrictions on an individual's possession of a firearm

are imposed based on, e.g., the type of firearm; the individual's age, criminal history, or mental illness; provisions of protective orders; and on the possession of weapons in certain locations. *See id.* at 2-6, 11, 15-18; *see* chapter 9.41 RCW.

Generally, to carry a concealed weapon a person must have a license to carry a concealed pistol. RCW 9.41.050(1)(a).[2] A person may not lawfully carry or place a loaded pistol in a vehicle unless the person has a concealed pistol license and the pistol is either on the licensee's person, the licensee is within the vehicle whenever the pistol is, or, if the licensee is away from the vehicle, the pistol is locked inside and concealed from view from outside. RCW 9.41.050(2)(a). Washington is a "shall issue" state, meaning that law enforcement officials are required to issue a concealed pistol license to any applicant who meets statutory requirements. WASHINGTON FIREARMS LAWS SUMMARY 2018, *supra*, at 12; RCW 9.41.070.

Mr. Tarango places substantial reliance on the United States Supreme Court's decision in *J.L.* In that case, police made an investigative stop after an anonymous caller reported that a young black man standing at a particular bus stop and wearing a plaid shirt was carrying a concealed gun. They were able to locate a 15-year-old black man meeting the caller's description at the reported location. No gun was seen by police on arrival, but one was found on J.L.'s person when he was detained and frisked.

---

[2] Excepted from the requirement are carrying a concealed weapon in the person's place of abode or fixed place of business. RCW 9.41.050(1)(a).

Unlike the facts in our case, the clear implication of the opinion in *J.L.*—and its premise—is that the information law enforcement received from the 911 call was that the young black man *illegally* possessed the gun.[3] According to the decisions of the Florida courts, the tip received was that a concealed weapon violation was taking place. This is clear from the decision of the intermediate appellate court, *see State v. J.L.*, 689 So. 2d 1116, 1117 (Fla. Dist. Ct. App. 1997) ("The police received an anonymous complaint that a concealed weapon violation was taking place."), and from the decision of the Florida Supreme Court that quashed that decision, *J.L. v. State*, 727 So. 2d 204, 206 (Fla. 1998) (analyzing the case as falling within the class of tips that allege criminal conduct but only describe innocent details of identification). The decision of the United States Supreme Court reveals that under applicable Florida law, it was a crime for someone under the age of 18 to possess a firearm, and as previously indicated, J.L. was 15.

Rather than turning on whether information that an individual possesses a gun is enough to justify an investigative detention, *J.L.* turned on case law holding that

---

[3] *E.g., J.L.*, 529 U.S. at 268 ("*Apart from the tip*, the officers had no reason to suspect any of the three [individuals at the bus stop] of *illegal conduct*" (emphasis added)), 271 (citing to an argument by amicus that "a stop and frisk should be permitted 'when (1) an anonymous tip provides a description of a particular person at a particular location *illegally* carrying a concealed firearm,'" along with other factors (emphasis added)), 272 (characterizing the State as supporting an exception to *Terry* under which "a tip *alleging an illegal gun* would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing" (emphasis added); such an exception could set in motion a search "simply by placing an anonymous call falsely reporting the target's *unlawful carriage of a gun*" (emphasis added)).

information obtained from an anonymous tip does not provide reasonable suspicion

unless, through corroboration, the tip exhibits sufficient indicia of reliability. 529 U.S. at

270. On appeal to the Supreme Court, the State of Florida argued that because of the

danger posed by firearms, officers receiving a tip that an individual illegally possesses a

firearm should only need partial corroboration, of any "innocent details" provided by the

anonymous source:

> To require police, in situations where there is an anonymous tip that a
> specific individual is unlawfully carrying a firearm not observed by police
> officers, to wait for the brandishment or use of the firearm before finding
> reasonable suspicion effectively negates the *Terry* doctrine. Thus, in the
> instant situation, where *innocent details* of the anonymous tip are
> immediately verified, reasonable suspicion exists that the individual is
> committing a crime.

Pet'r's Br. on the Merits, *Florida v. J.L.*, No. 98-1993, 1999 WL 1259993, at \*8 (U.S.

Dec. 23, 1999) (emphasis added). The State of Florida argued that once officers found

three black youths at the bus stop, one wearing a plaid shirt, they had sufficient

corroboration.

The Supreme Court refused to modify the reliability analysis for anonymous tips

of illegal possession of a firearm, holding, "The reasonable suspicion here at issue

requires that a tip be reliable *in its assertion of illegality*, not just in its tendency to

identify a determinate person." *J.L.*, 529 U.S. at 272 (emphasis added).

In denying Mr. Tarango's suppression motion, the trial court correctly observed

that whether an anonymous tip was sufficiently corroborated was not at issue in this case,

11

which does not involve an anonymous tip. Mr. Matthews provided his name and telephone number to the 911 operator. He even remained in the parking lot of the grocery store until he could see that police had arrived in response to his 911 call.

Mr. Tarango also cites this court's decision in *Cardenas-Muratalla*, which relies on *J.L.* We recognize that the opinion in *Cardenas-Muratalla* states at one point, citing only to *J.L.*, that "[t]he presence of a firearm in public alone is insufficient for an investigatory stop." 179 Wn. App. at 313. We view the statement's unwarranted citation to *J.L.* as dicta, since the remainder of the opinion in *Cardenas-Muratalla*—which involved an anonymous tip—legitimately follows *J.L.*'s holding that an *anonymous* report of someone's illegal possession of a firearm is not, without more, sufficient to support a *Terry* stop.

We agree that the presence of a firearm in public *is* insufficient, standing alone, to support an investigatory stop, even if we do not agree with *Cardenas-Muratalla*'s reliance on *J.L.* for support. Support for the proposition is provided by the well-settled requirement that to conduct a *Terry* stop, an officer must have a reasonable and individualized suspicion of criminal activity based on specific and articulable facts known to the officer at the inception of the stop. Our agreement with the proposition is reinforced by the United States Supreme Court's Second Amendment decisions in *District of Columbia v. Heller*, 554 U.S. 570, 628, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d

894 (2010), and by our Supreme Court's similar construction of article I, section 24 of the Washington Constitution in *City of Seattle v. Evans*, 184 Wn.2d 856, 366 P.3d 906 (2015) and *State v. Rupe*, 101 Wn.2d 664, 683 P.2d 571 (1984).

In *Heller*, the Supreme Court construed "the inherent right of self-defense" as "central to the Second Amendment right [to bear arms]" and as extending to the lawful possession of handguns—a "class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." 554 U.S. at 628. In *McDonald*, the Court held that the Fourteenth Amendment incorporates the Second Amendment right, making it fully applicable to the states. 561 U.S. at 749-50.

In *Evans*, our Supreme Court held that the Washington Constitution's guarantee of the right to bear arms "protects instruments that are designed as weapons traditionally or commonly used by law-abiding citizens for the lawful purpose of self-defense." 184 Wn.2d at 869. Our Supreme Court has also characterized Washington's constitutional protection of the right to bear arms as facially broader than the Second Amendment[4] and has held that possession of legal firearms "falls squarely within the confines of the right." *Rupe*, 101 Wn.2d at 706.

---

[4] Article I, section 24 of the Washington Constitution provides:

The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men.

Since openly carrying a handgun is not only *not* unlawful, but is an individual right protected by the federal and state constitutions, it defies reason to contend that it can be the basis, without more, for an investigative stop.

The State offers a defense of the trial court's suppression decision by suggesting that the trial court *had* more:

> [T]he facts that police had at the time they stopped Mr. Tarango were: (1) Mr. Tarango was sitting in a vehicle; (2) the vehicle was "behind" the Bargain Giant store; (3) Mr. Tarango had a handgun in his hand; (4) there was a high risk to the public of robberies of establishments such as the Bargain Giant; (5) the named complainant called 911 to report what he had seen and left his information.

Br. of Resp't at 12-13. From this, the State argues that "[a] reasonable inference . . . may be drawn . . . that the complainant was concerned about Mr. Tarango's presence with a handgun in the parking lot of the Bargain Giant." *Id.* at 13.

The evidence and argument at the suppression hearing attached no importance to Mr. Matthews's report that the Suburban was parked "behind" the grocery store—which is, after all, where Mr. Matthews parked. The trial court did not find that the Suburban was parked "behind" the store or that where it was parked was relevant to suspecting criminal activity.

The court's findings also make no reference to a high risk of robberies to neighborhood grocery stores, which was not argued as a basis for reasonable suspicion

14

during the suppression hearing. Only one responding officer mentioned such a risk in his report. The State's suggestion that in a high-risk setting there is a substantial possibility that an individual openly carrying a handgun is planning to commit a robbery rather than merely exercising the constitutional right to self-defense is not persuasive. *See Kennedy*, 107 Wn.2d at 6 (adopting the "substantial possibility" standard for deciding whether ambiguous conduct is noncriminal or criminal).

Finally, as to the relevance of the fact that Mr. Matthews was concerned enough to make a 911 call, the federal Court of Appeals for the Sixth Circuit has observed that laypersons in open carry jurisdictions might have a misplaced concern on seeing an individual openly carrying a firearm, unaware that it is legal. *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1131-32 (6th Cir. 2015). A police officer, on the other hand, "ha[s] no basis for such uncertainty . . . at least with regard to unambiguous statutes." *Id.* at 1132. In *Northrup*—a civil rights action against an officer who stopped (and later arrested) a plaintiff openly carrying a handgun—the appellate court rejected the officer's "reasonable suspicion" defense and held that he was not entitled to qualified immunity.

In so holding, *Northrup* cited with approval a Fourth Circuit case holding that the possibility that an individual's possession of a firearm might be illegal—the person might be a felon, for instance—was not a justification for a *Terry* stop: "Where it is lawful to

possess a firearm, unlawful possession 'is not the default status.'" *Id.* (quoting *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013)). Among other jurisdictions that have concluded that where openly carrying a firearm is legal, the exercise of the right, without more, cannot justify an investigatory detention, include the Tenth, Third, Fifth and Eighth Circuit Courts of Appeal and the Supreme Court of Indiana. *See United States v. King*, 990 F.2d 1552, 1559 (10th Cir. 1993); *United States v. Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000); *United States v. Roch*, 5 F.3d 894, 899 (5th Cir. 1993); *Duffie v. City of Lincoln*, 834 F.3d 877, 883 (8th Cir. 2016); *Pinner v. State*, 74 N.E.3d 226 (Ind. 2017).

Because the officers conducting the *Terry* stop of the Suburban had no information at the inception of the stop that Mr. Tarango or Ms. Hutchinson had engaged in or were about to engage in criminal activity, they lacked reasonable suspicion. The motion to suppress should have been granted. We grant Mr. Tarango his requested remedy of reversing the firearm possession convictions and remanding the case for further proceedings. For reasons explained in the unpublished portion of this opinion, we direct the trial court to dismiss the charge of unlawful possession of the revolver (count II).

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

16

INSUFFICIENT EVIDENCE SUPPORTS MR. TARANGO'S CONVICTION ON COUNT II

We next address whether sufficient evidence supports Mr. Tarango's conviction on count II: his alleged unlawful possession of the revolver recovered from the canvas bag located behind where he had been seated.

RCW 9.41.040(1)(a) makes it a crime for a person to "own[ ], ha[ve] in his or her possession, or ha[ve] in his or her control any firearm after having previously been convicted or found not guilty by reason of insanity . . . of any serious offense." Mr. Tarango stipulated to his prior conviction of a serious offense. But since the only State witness offering direct evidence of his possession of a firearm saw Mr. Tarango holding a Glock, not a revolver, he challenges the sufficiency of evidence that he had the latter in his possession or control. If the evidence is insufficient, Mr. Tarango is entitled not only to reversal of his conviction on count II, but to dismissal of the charge.

"'The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.'" *State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). A criminal defendant's claim of insufficient evidence admits the truth of the State's evidence and "'all inferences that reasonably can be drawn [from it].'" *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015) (alteration in original) (quoting *Salinas*, 119 Wn.2d at 201).

Possession can be actual or constructive. *State v. Turner*, 103 Wn. App. 515, 520,

13 P.3d 234 (2000). In closing, the prosecutor told jurors:

> [I]f Mr. Tarango was seen with the Glock and then the Glock ends up right
> behind the seat and the bag is right over the Glock, you can decide whether
> or not Mr. Tarango must have been manipulating that bag, must have had
> the bag in his possession and, thus, the firearm in his possession.

RP (Dec. 5, 2016) at 462.

Two decisions of our Supreme Court are key. *State v. Callahan* is a seminal case

holding that a "momentary handling" or "passing control" of property is not enough to

prove its unlawful possession. 77 Wn.2d 27, 29, 459 P.2d 400 (1969) (citing *United

States v. Landry*, 257 F.2d 425, 431 (7th Cir. 1958)). The *Callahan* court reviewed prior

Washington cases affirming drug possession convictions and summarized them as

involving evidence in each instance that the defendant was in dominion and control of

either the drugs or the premises on which the drugs were found. It distinguished the

State's evidence against Callahan, who had been residing temporarily on a houseboat

where drugs were seized; he had merely been in close proximity to the drugs and handled

them momentarily. *Id.* at 31. The court found his mere proximity and momentary

handling of the drugs was not sufficient to establish dominion and control. *Id.* at 29.

A second and much more recent case is *State v. Davis*, 182 Wn.2d 222, 340 P.3d

820 (2014) (plurality opinion) in which the dissent by Justice Stephens expressed the

opinion of the majority of the court on the issue of whether the State had proved two

defendants' possession of a firearm. Defendant Davis was at his home when an acquaintance, Maurice Clemmons arrived, told Davis that he had been shot while killing four police officers, and requested a ride to the home of a third individual, Nelson. Lead opinion at 225. Upon arrival at the Nelson home, Clemmons was given fresh clothing and help treating his gunshot wound. *Id.* Nelson put some clothes and a gun that Mr. Clemmons had stolen from one of the officers into a shopping bag, leaving it on a counter. *Id.* Just before leaving, Clemmons asked where the gun was and Davis replied it was in the shopping bag, which he handed to Clemmons. *Id.* In addition to later being found guilty of criminal assistance, Davis and Nelson were found guilty of possession of a stolen firearm, and Davis was also found guilty of unlawful possession of a firearm. *Id.*

The court majority characterized the facts as resembling the lack of dominion and control addressed in *Callahan* "because neither Davis nor Nelson asserted any interest in the gun. Instead, they briefly handled the item for Clemmons, the true possessor of the gun." *Id.* at 235 (Stephens, J., dissenting). The majority also found that Davis's and Nelson's momentary handling of the gun was insufficient to prove actual possession. Dissent at 237. It viewed Clemmons's intimidating character and actions as a circumstance contributing to his, rather than Davis's or Nelson's, dominion and control. *Id.* at 235. *See also State v. Chouinard*, 169 Wn. App. 895, 899-900, 903, 282 P.3d 117 (2012) (fact that back seat passenger saw a rifle that was placed in the vehicle's trunk and protruded into the back seat was insufficient; defendant's mere proximity to the rifle and

knowledge of its presence was not enough to sustain a conviction for constructive

possession).[5]

The prosecutor's argument to the jurors in Mr. Tarango's case that "Mr. Tarango

must have been manipulating th[e canvas] bag" to have placed the Glock underneath it

relies on only a momentary handling of the bag in which the revolver was located. RP

(Dec. 5, 2016) at 462. The facts are substantively indistinguishable from *Callahan* and

*Davis.* Evidence of possession of the revolver was insufficient and Mr. Tarango is

entitled to dismissal of that charge.[6]

The State points out in responding to Mr. Tarango's brief that his assignments of

error do not provide a basis for reversing his conviction for escape from community

custody. Mr. Tarango does not disagree.

---

[5] We recognize that in the atypical case where a reasonable juror might find a defendant's connection to property to be a "momentary handling" or "passing control," it could be difficult to make that argument from the pattern instruction on possession of a weapon. *See* 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL § 133.52, at 678 (4th ed. 2016). Additional instruction would be appropriate.

[6] The prosecutor also fleetingly invited jurors during closing to consider that ammunition for the Glock was found in the canvas bag. RP (Dec. 5, 2106) at 462 (inviting jurors to look at "the nexus between the Glock .40 caliber and the ammunition for the Glock .40 caliber being in that bag"). But that was not the testimony of the corrections officer who performed the search. *See* RP (Dec. 5, 2016) at 124 (testifying, "I do not recall if the ammunition was in the bag or not, or the ammunition box was in there or not"), 126 (stating that the ammunition "could have been" in the bag, but he didn't know). The possibility that the ammunition might have fallen from the bag would not support a finding, beyond a reasonable doubt, that Mr. Tarango possessed the revolver.

20

We reverse Mr. Tarango's convictions for unlawful possession of a firearm, direct the trial court to dismiss the charge stated as count II, and remand for further proceedings.[7]

Siddoway, J.

WE CONCUR:

Fearing, J.

Pennell, A.C.J.

---

[7] Because the State is not the substantially prevailing party, we need not address Mr. Tarango's request that we deny any State request for an award of costs. Our decision renders moot the issues raised in Mr. Tarango's pro se statement of additional grounds.