**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

MARC ANTHONY WILLY,
*Defendant-Appellee.*

No. 21-30006

D.C. Nos.
1:19-cr-02059-SAB-1
1:19-cr-02059-SAB

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Stanley A. Bastian, Chief District Judge, Presiding

Argued and Submitted February 7, 2022
Seattle, Washington

Filed July 26, 2022

Before: Jay S. Bybee and Morgan Christen, Circuit Judges,
and James V. Selna,[*] District Judge.

Opinion by Judge Bybee;
Dissent by Judge Christen

---

[*] The Honorable James V. Selna, United States District Judge for the
Central District of California, sitting by designation.

## SUMMARY**

### Criminal Law

The panel affirmed the district court's order granting Marc Anthony Willy's motion to suppress evidence and statements obtained after his arrest, in a case that required the panel to determine whether there was probable cause to arrest Willy for displaying a weapon in a manner that "warrant[ed] alarm for the safety of other persons." Wash. Rev. Code § 9.41.270(1).

Willy was arrested after two people separately reported that a man in a truck had displayed a firearm while asking them questions about an alleged kidnapping in the area. After his arrest, a search of Willy's vehicle and person recovered illegal firearms and a modified $CO_2$ cartridge. He was charged with making and possessing a destructive device in violation of the National Firearms Act.

Explaining important context for Willy's actions, the panel noted that Washington is an open carry state (*i.e.*, it is presumptively legal to carry a firearm openly) in which it is a misdemeanor to carry a concealed pistol without a license, but also a "shall issue state" meaning that local law enforcement must issue a concealed weapons license if the applicant meets certain qualifications. The panel wrote that the bare fact that Willy displayed a weapon would not be sufficient to stop Willy, because there is no evidence that Willy was carrying a concealed weapon. Noting that

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Washington courts have narrowed terms in § 9.41.270(1) to preserve the constitutionality of the statute, the panel observed that what emerges is a workable standard: The act must warrant alarm in a reasonable person for the safety of others.

A sheriff's deputy's suspicion that Willy had violated § 9.41.270 arose not from his own observations but from the accounts of the two reporting parties. The panel wrote that it was reasonable for an officer in the sheriff's deputy's position to rely on the information, but concluded that the deputy did not, consistent with Washington law and the Fourth Amendment, have probable cause to arrest Willy without further inquiry for three reasons. First, it was not clearly erroneous for the district court to conclude that neither reporting party indicated to the deputy that Willy displayed his firearm in a threatening manner. Second, § 9.41.270(1) requires more than the mere display of a firearm, and at the time the deputy located Willy, he did not have sufficient information to reasonably believe Willy had displayed his gun in a manner that warrants alarm. The panel wrote that although the reports indicated that Willy displayed the firearm rather than just carrying it, this distinction does not, in an open-carry state, create enough of a possibility of criminal activity that Willy was subject to immediate arrest without further investigation. Finally, the district court accurately stated that § 9.41.270(1) both incorporates a reasonable person standard and does not require that a person's actions actively cause alarm.

As the government did not challenge application of the "fruit of the poisonous tree" doctrine, the panel affirmed the district court's application of the exclusionary rule to

suppress Willy's statements, the firearms, and the CO2 device.

Dissenting, Judge Christen wrote that the deputy without question had probable cause to suspect that Willy violated the second clause of § 9.41.270(1) because the reliability of the callers' reports was verified when the details they provided checked out; and it was the deputy's perilous duty to arrest Willy, a man he had good reason to believe to be armed and mentally compromised, for displaying a firearm "in a manner, under circumstances, and at a time and place that . . . warrants alarm for the safety of other persons."

---

## COUNSEL

Richard C. Burson (argued), Assistant United States Attorney; Joseph H. Harrington, Acting United States Attorney; United States Attorney's Office, Yakima, Washington; for Plaintiff-Appellant.

Jeremy B. Sporn (argued), Federal Defenders of Eastern Washington and Idaho, Yakima, Washington, for Defendant-Appellee.

**OPINION**

BYBEE, Circuit Judge:

This case requires us to determine whether there was probable cause to arrest Marc Anthony Willy for displaying a weapon in a manner that "warrant[ed] alarm for the safety of other persons." Wash. Rev. Code § 9.41.270(1). Willy was arrested after two people separately reported that a man in a truck had displayed a firearm while asking them questions about an alleged kidnapping in the area. After his arrest, a search of Willy's vehicle and person recovered illegal firearms and a modified $CO_2$ cartridge. Willy was charged with making and possessing a destructive device in violation of the National Firearms Act, 26 U.S.C. § 5861. The district court granted Willy's motion to suppress all evidence and statements obtained after his arrest because his arrest was not supported by probable cause. We affirm.

## I. BACKGROUND

On May 12, 2019, the Yakima County's Sheriff's Office received a call from a witness ("Reporting Party 1") stating that a man had pulled up outside of his home in a vehicle and displayed a firearm. Dispatch relayed this information to Deputy Curtis Thaxton, who interviewed Reporting Party 1 at his residence. Reporting Party 1 told Deputy Thaxton that a white male in a green truck pulled up on the street in front of his house and began talking about being abducted and kept somewhere in the area. The man said he was trying to find the place where he was kept. During the conversation, the man pulled out a semiautomatic pistol, racked the slide, and then put it down. Reporting Party 1 expressed concern about the man's mental state. He provided Deputy Thaxton with

the truck's license plate number, and the vehicle came back as registered to Marc Willy. Thaxton showed Reporting Party 1 Willy's Department of Licensing photo, and he identified Willy as the man with whom he had spoken. Reporting Party 1 said that Willy made no threats to him, nor had Willy pointed the pistol at him at any time.

About ten minutes after leaving Reporting Party 1's residence, Deputy Thaxton responded to another report from dispatch. The second call had come from Reporting Party 2, who lived about three miles from the previous caller. Deputy Thaxton spoke to the second witness over the phone because Reporting Party 2 had already left her residence. Reporting Party 2 stated that a man with a name like "Willis" pulled up to her gate in a green truck when she was leaving her house and told her that he had been kidnapped and held in a camouflaged trailer or van in the area and that he was trying to find it. While they were talking, the man told her he was armed and then displayed a pistol and put it away. Reporting Party 2 told the man she did not know the place he was looking for, and he drove away. Reporting Party 2 said that she was not was not directly threatened, nor was Willy argumentative or hostile.

Deputy Thaxton resumed patrol and testified that at this point he was concerned that Willy was "a danger to himself or others in the area," because

> the way he was rambling on, that things weren't completely coherent what was going on; that he would possibly use it if confronted with somebody else, that he had made contact with somebody else; that once the gun's out—normal people just don't walk around

displaying firearms out to people when they
pull up.

Thaxton believed Willy "had already committed the violation of carry, exhibit, draw a dangerous weapon or firearm with an intent to create an affront or alarm to another." *See* Wash. Rev. Code § 9.41.270.[1] Deputy Thaxton located the green truck pulling into a gas station. Once he confirmed the license plate matched the one given to him by Reporting Party 1, Deputy Thaxton turned on his emergency lights and conducted a "high-risk stop." With his firearm drawn, Deputy Thaxton ordered Willy out of the vehicle. Willy complied with all of Deputy Thaxton's orders. While making Willy turn around, Deputy Thaxton saw a pistol holstered on his hip. Deputy Thaxton removed the gun, put Willy in handcuffs, and escorted him to the back seat of the police vehicle.

After securing Willy's pistol in the patrol car, Deputy Thaxton noticed that the gun had the serial number scratched off. Deputy Thaxton read Willy his *Miranda* rights, and Willy indicated that he was willing to talk to Deputy Thaxton.

---

[1] Section 9.41.270 provides in relevant part:

> It shall be unlawful for any person to carry, exhibit, display, or draw any firearm, dagger, sword, knife or other cutting or stabbing instrument, club, or any other weapon apparently capable of producing bodily harm, in a manner, under circumstances, and at a time and place that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons.

Wash. Rev. Code § 9.41.270(1). Violation of this subsection is a gross misdemeanor. *Id.* § 9.41.270(2).

Willy told Deputy Thaxton that he had been abducted and kept at a location for several days and that he had escaped but police had not done anything to help him. When asked about the scratched off serial number, Willy stated that he bought the gun already in that condition three or four years previously at a gun show in Spokane.

Willy consented to a search of his truck and stood by the patrol car while Deputy Thaxton started the search. As Deputy Thaxton moved to the passenger-side door, Willy told him that there was a sawed-off shotgun on the rear floorboard of the truck. Deputy Thaxton recovered a non-functional short-barrel shotgun from the vehicle. After the vehicle search, Deputy Thaxton took Willy to Yakima County Jail for booking. When Thaxton searched Willy, he recovered a $CO_2$ cartridge that had crimp marks around the neck and two pieces of fuse coming out of the neck. ATF agents later determined that the device qualified as a "destructive device" under 26 U.S.C. § 5845(f).

Deputy Thaxton conferred with the prosecutor's office and told them his reasons for arresting Willy. The prosecutor recommended charging Willy with possessing an altered-number pistol and a short-barrel shotgun. In his "Declaration of Probable Cause," in support of those two charges, Deputy Thaxton wrote that "[Willy] displayed a black semi auto pistol [to Reporting Witness 1] and loaded it (racked the slide). [Willy] never threatened anyone with it and didn't point it towards him." He also wrote that Reporting Witness 2 said "[Willy] told her he was armed and displayed a black pistol" and that "[Willy] never threatened her with it or pointed it at her." Willy was ultimately charged with violating § 9.41.270 and altering the serial number on

the pistol. The record does not disclose any resolution of the state charges.

A federal grand jury in the Eastern District of Washington returned a three-count indictment charging Willy with receiving and possessing an improvised explosive device—the altered $CO_2$ cartridge—in violation of 26 U.S.C. § 5861(c), receiving and possessing an improvised explosive device which was not registered to him in violation of 26 U.S.C. § 5861(d), and making an improvised explosive device in violation of 26 U.S.C. § 5861(f). Willy filed a motion to suppress the evidence. A hearing on the motion was held, during which Deputy Thaxton testified. The district court granted the motion to suppress, finding that although Deputy Thaxton had reasonable suspicion to conduct an investigatory stop, Thaxton lacked probable cause to make the arrest. The evidence was "tainted by the illegality of the arrest." The government filed a timely notice of appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291. We review de novo the district court's ruling on a motion to suppress and for clear error any underlying findings of historical fact. *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016). We must "give due weight to inferences drawn from th[e] facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). The district court's interpretation of state law, including state statutes, is reviewed de novo. *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 995 (9th Cir. 2017).

## III. DISCUSSION

The Fourth Amendment, applicable to the United States and made applicable to the states by the Fourteenth Amendment, protects the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. U.S. Const. amend. IV; *see Terry v. Ohio*, 392 U.S. 1, 8 (1968). The Fourth Amendment provides that a warrant for arrest "shall [not] issue, but upon probable cause." In this case, Willy was arrested for violating § 9.41.270—only later was he charged with altering the serial number on the pistol (the basis for a second state charge actually filed against him) or possessing the crimped $CO_2$ cartridge (the basis for the federal charges). The evidence supporting the federal charges was seized after Willy's arrest during a search at the jail. Thus, the "constitutional validity of the search . . . depend[s] upon the constitutional validity of [Willy's] arrest." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Accordingly,

> [w]hether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, [Deputy Thaxton] had probable cause to make it—whether at that moment the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.

*Id.*; *see also United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).

Deputy Thaxton testified that, even before he found Willy at a service station and activated his light bar, he had determined that Willy had violated Washington law and that he was going to arrest Willy. Since Thaxton himself had not observed any suspicious conduct by Willy, the question is whether he had probable cause to arrest Willy based only on the two reports.

"Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable prudent men, not legal technicians, act.'" *Ornelas*, 517 U.S. at 695 (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). We do not have "a neat set of legal rules," *Gates*, 462 U.S. at 232, but must "examine whether the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe a suspect has committed, is committing, or is about to commit a crime." *United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir. 1994). Although we do not have a precise test, "probable cause" is a higher standard than the "reasonable suspicion" required to conduct a *Terry* stop and make further inquiries. *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) ("[T]he level of suspicion the [*Terry* stop] standard requires is . . . obviously less than is necessary for probable cause." (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014))).

We thus turn to Washington law to determine whether Deputy Thaxton had grounds under § 9.41.270 for arresting Willy. *See United States v. Bontemps*, 977 F.3d 909, 914 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2874 (2021).

A. *The Scope of Washington Revised Code § 9.41.270*

We begin with important context for Willy's actions. Washington is an open carry state. That means that it is presumptively legal to carry a firearm *openly*. As we recently observed in *United States v. Brown*, 925 F.3d 1150 (9th Cir. 2019), it is a misdemeanor to carry a *concealed* pistol without a license, but "Washington is a 'shall issue state,' meaning that local law enforcement *must* issue a concealed weapons license if the applicant meets certain qualifications." *Id.* 1154 (emphasis in original). The bare fact that Willy displayed a weapon would not be sufficient to stop Willy, because there is no evidence that he was carrying a concealed weapon. The reporting parties' statements that Willy was carrying a gun "created at most a very weak inference that he was unlawfully carrying the gun [concealed] without a license, and certainly not enough to alone support a *Terry* stop." *Id.* Moreover, Thaxton acquired no additional reasons for arresting Willy until after he stopped him: When Thaxton ordered Willy to leave his truck and turn around slowly, Willy was openly carrying his pistol, in a holster on his hip.

As we have observed, notwithstanding that Washington is an open carry state, it is a gross misdemeanor in Washington for a person to "carry, exhibit, display, or draw any firearm . . . in a manner, under circumstances, and at a time and place that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons." Wash. Rev. Code § 9.41.270(1). The Washington courts have construed critical terms in the statute, narrowing them to preserve the constitutionality of the statute. Two cases are of particular note.

In the first, *State v. Maciolek*, 676 P.2d 996 (Wash. 1984), the Washington Supreme Court addressed a void-for-vagueness challenge to § 9.41.270. *Maciolek* involved two separate convictions under § 9.41.270, consolidated for the appeal. In the first case, Maciolek was convicted of violating § 9.41.270 after he became angry when his doctor would not renew his prescription for Percodan. Maciolek "deliberately pulled back his jacket to reveal a handgun . . . . The doctor, alarmed and intimidated by this display, immediately wrote out a prescription for Percodan." *Id.* at 997. In the second case, Johnson was a 13-year old who had an altercation with a pair of 9-year olds. He fired his BB gun at them and then took one of their bikes. *Id.* The Washington Supreme Court held that the statute was not void for vagueness and upheld both convictions.[2] The cases challenged the statute on two grounds: the vagueness in the phrase "a knife or other cutting or stabbing instrument" and in the phrase "in a manner, under circumstances and at a time and place that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons." Only the latter phrase is in play here. The court began with the definition of "intimidate," which it said was "defined very narrowly" as to "inspire or affect with fear . . . (as by threats)." *Id.* at 999 (quoting *Webster's Third New Int'l Dictionary* 1184 (1961)). In a lengthy footnote, the court stated that the phrase "warrants

---

[2] The court also affirmed a third case, in which the defendant was seen chasing a woman up the center of the street with a knife. The defendant was convicted under a Seattle municipal statute similar to § 9.41.270. *Maciolek*, 676 P.2d at 997.

alarm for the safety of other[s]" was sufficiently qualified by other language to "giv[e] the statute a narrow scope":

> If a weapon is displayed in a manner, under circumstances and at a time and place so that it poses a threat to another person, such a display would warrant alarm for the safety of another. Thus, narrowly construing the phrase to apply to only conduct that poses a threat to others gives the phrase a narrow and definite focus and saves it from vagueness. Such a construction is also consistent with the statute's purpose, which is to prevent someone from displaying dangerous weapons so as to reasonably intimidate members of the public.

*Id.* at 1001 n.3 (citations omitted).

The second is a decision of the Washington Court of Appeals, *State v. Spencer*, 876 P.2d 939, 943 (Wash. Ct. App. 1994), upholding the statute against a challenge under Washington's equivalent of the Second Amendment.[3] Spencer was convicted under § 9.41.270 when he was seen by multiple people walking with his dog at night in an urban area

---

[3] The Washington Constitution provides:

> The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men.

Wash. Const. art. 1, § 24.

with an AK-47S, with the magazine attached, on his shoulder. The responding officer saw Spencer "in 'a hostile, assaultive type manner with the weapon ready.'" *Id.* at 940. The Washington Court of Appeals rejected the constitutional challenge. It found that "the statute does not prevent a person from carrying weapons in self-defense" and "[i]f there is no present threat, weapons must be carried in a manner that does not warrant alarm in others." *Id.* at 941. The court explained that § 9.41.270

> only prohibits the carrying or displaying of weapons when objective circumstances would warrant alarm in a reasonable person. Thus, the restriction applies only in a limited number of situations. . . . In the vast majority of situations, a person of common intelligence would be able to ascertain when the carrying of a particular weapon would reasonably warrant alarm in others.

*Id.* at 942 (footnote omitted). In a pair of footnotes, the court added that "[t]hese circumstances may include, as in [Spencer's] case, the fact that the weapon is being carried in a residential neighborhood, the time of day, the urban environment, the manner in which the weapon is carried, the size and type of weapon, and the fact that the weapon has a clip visibly attached. . . . [Spencer's case] does not fall anywhere near a potential 'grey area' in the statute." *Id.* at 942 nn.4–5. The court then visited the question raised in *Maciolek*, whether the statute was void for vagueness. The Court of Appeals held that the statute had "a sufficiently narrow scope." *Id.* at 943. It also adopted a lower court's reading that "a reasonable person standard is incorporated into the phrase 'warrants alarm.'" *Id.*; *see id.* at 943 n.7

("[T]here must be a sufficient objective basis for the alarm, *i.e.,* circumstances must be such that a reasonable person would be alarmed."). "When viewed with these two limitations in mind, it is clear that the statute is sufficiently definite to (1) provide defendants with adequate notice of prohibited conduct and (2) provide adequate enforcement standards." *Id.* at 943. In Spencer's case, the court repeated, "[a]ny reasonable person would feel alarmed upon seeing, on a residential street at night, a man carrying a visibly loaded AK-47 assault rifle in an assaultive manner. . . . [A] person of common intelligence would realize that carrying an assault rifle under such circumstances and in such a manner would warrant alarm in others." *Id.* at 943–44.

If we consider *Maciolek* and *Spencer* together, what emerges is a workable standard for judges and juries to evaluate: The act must warrant alarm in a reasonable person for the safety of others. *Maciolek*, 676 P.2d at 1001 n.3; *Spencer*, 876 P.2d at 943 & n.7. A broader construction, Washington courts have suggested, might well run afoul of void-for-vagueness principles or the right under the Washington Constitution "to bear arms in defense of himself."

The dissent insists on reading the phrase "warrants alarm for the safety of other persons" in isolation. Dissenting Op. at 34. This approach expands § 9.41.270(1) beyond its intended scope. As the Washington courts have explained, "narrowly construing the phrase ['warrants alarm for the safety of other[s]'] to apply to only conduct that poses a threat to others gives the phrase a narrow and definite focus and saves it from vagueness" and is consistent with the statute's purpose. *Maciolek*, 676 P.2d at 1001 n.3. Although Willy's conduct could only arguably violate the "warrants

alarm" portion of the statute, the rest of the statute is not irrelevant—it gives us the proper context and respects Washington's decision to interpret § 9.41.270(1) to avoid constitutional problems. The preceding phrase, "manifests an intent to intimidate another," indicates that the Washington legislature did not intend "warrants alarm for the safety of other persons" to apply broadly to all conduct that might raise concern—a reading that swallows the first portion of the statute.[4] Rather, the "warrants alarm" portion is best read as capturing the scenarios where someone is not directly threatening a person who is present, but is handling their firearm in such a way that it presents a danger to others. *See State v. Workman*, 584 P.2d 382, 386 (Wash. 1978) (holding that even though no one saw the firearm, the defendants handling of a gun while attempting to commit attempted armed robbery "warrant[ed] alarm for the safety of anyone who may chance to be nearby"). We choose to take the Washington courts' lead and read "warrants alarm" to refer to conduct that a reasonable person would believe poses a threat to themselves or other persons.

We have reviewed Washington cases involving charges or convictions under § 9.41.270. These cases have addressed a variety of circumstances, but all have involved palpable threats with a weapon and did not approach what the *Spencer* court termed "a potential 'grey area' in the statute." *Spencer*, 876 P.2d at 942 n.5. For example, in *State v. Baggett*,

---

[4] Indeed, under the dissent's expansive reading, it is hard to imagine conduct that would "manifest[] an intent to intimidate" without also "warrant[ing] alarm for the safety of other persons." Dissenting Op. 42–44. We must avoid rendering the first prohibition superfluous. *See Rivard v. State*, 231 P.3d 186, 190 (Wash. 2010). Instead, we should assume that the second portion of the statute attempts to capture related but not overlapping conduct.

13 P.3d 659 (Wash. Ct. App. 2000), a police officer saw Baggett leaning out of the passenger window of a parked car with a rifle, evidently about to shoot a cat on the side of the road. When Baggett saw the patrol car, he ordered his wife to drive away, but she stopped when the officer activated his siren. The officer instructed Baggett to drop his rifle, and Baggett pointed the rifle at the officer. The Washington Court of Appeals had no difficulty concluding that "[t]he manner in which he held the rifle warranted alarm for the safety of [the officer]." *Id.* at 662.

In *State v. Glenn*, 166 P.3d 1235 (Wash. Ct. App. 2007), a seven-year old boy reported that a man in a passing car had pointed a gun at him. His mother called 911 with the license plate of a car matching the boy's description. As the officers interviewed the boy, the car passed by and the boy again identified the car. The officers conducted a high-risk stop. The driver, Glenn, was ordered out of the car, handcuffed, and read his *Miranda* rights. The officers found $1,100 on Glenn and marijuana in his car; they never found a gun. The Washington Court of Appeals nevertheless upheld Glenn's conviction on the marijuana charge. The court held that the officers had "received a legitimate citizen's report that a driver had pointed a gun from his vehicle . . . . Pointing a gun at a victim is serious criminal conduct." *Id.* at 1239.

Other cases are consistent with these principles. *See State v. Evans*, 179 Wash. App. 1015 (2014) (upholding a search based on a 911 complaint that a man was "waving a gun at her daughter"); *State v. Hoston*, 175 Wash. App. 1073 (2013) (upholding a search based on a report by three men in an area known for gang activity who saw a man flash a handgun and then put it in his waistband in the context of a "rolling fight"); *State v. Owens*, 324 P.3d 757, 759 (Wash. Ct. App. 2014)

(upholding a § 9.41.270 conviction when after a verbal altercation which prompted a 911 call, Owens advised that he was going to get his gun since the cops were coming, ignored officers' orders, and continued approaching with a rifle); *State v. Smith*, 93 P.3d 877, 878 (Wash. Ct. App. 2003) (upholding § 9.41.270 conviction where Smith threatened, "I'm going to get my 45, and we'll take care of business," before returning and swinging his gun in the air, threatening with a pipe, and throwing a hammer); *State v. M.T.*, 97 Wash. App. 1067, at *3 (1999) (upholding a conviction based on a seven-year old's report that a man had approached her with a closed pocketknife which he thrust in the air; she had previously seen the man "pierce his own hand with the knife"; and "a reasonable person would be intimidated by M.T.'s display of the knife, even though the knife was closed"); *see also United States v. Caraang*, 2018 WL 2216103, at *1–3 (W.D. Wash. 2018) (holding that an officer had reasonable suspicion to stop Caraang where he was reported to have waved a gun in a bar parking lot in the presence of five to ten people, racked the slide, and yelled "anybody want some?"); *Hill v. Ramsdell*, 2016 WL 1304847 (W.D. Wash. 2016) (holding that police had probable cause to arrest Hill on § 9.41.270 charges when he attended a city council meeting wearing what appeared to be brass knuckles); *State v. Mitchell*, 906 P.2d 1013 (Wash. Ct. App. 1995) (holding that an officer had reasonable suspicion to stop Mitchell when he was carrying a semi-automatic weapon in an urban, residential area at night, he tucked the gun in his waistband when he saw the officer, and tossed the gun when the officer ordered him to put his hands up).[5]

---

[5] The dissent argues that *Mitchell* cannot be squared with our reading of § 9.41.270. Dissenting Op. at 43–44. First, we note that the *Mitchell* court only determined that the officers had reasonable suspicion to

Just as important to our analysis, Washington courts have refused to enforce § 9.41.270 when the threats are not sufficiently direct or imminent. For example, in *State v. Cardenas-Muratalla*, 319 P.3d 811 (Wash. Ct. App. 2014), police received a 911 call reporting a man with a gun in a high crime area of downtown Seattle. Police saw a man answering the description—Cardenas-Muratalla—and thought that he "fluffed" his sweatshirt when he saw the approaching patrol car. When Cardenas-Muratalla did not stop in response to the officers' instructions, the officers tased and shot him. Cardenas-Muratalla was carrying an unloaded pistol in his waistband. The Washington Superior Court refused to suppress the evidence of the gun, but the Washington Court of Appeals reversed. The court held that the 911 call had not reported any criminal activity: "Carrying a firearm is a crime if it is carried or displayed in a manner that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons." *Id.* at 816 (footnote omitted; citing § 9.41.270). In *Cardenas-Muratalla*, "[t]here [was] no evidence in the record that the 911 caller reported being intimidated or alarmed when the suspect showed him the gun or that the suspect discharged the

conduct a *Terry* stop based on § 9.41.270. 906 P.2d at 1016. Mitchell was arrested for being a minor in possession of a handgun only after the officers learned of his identity and criminal record. *Id.* at 1015. Second, when officers passed Mitchell, who was walking in an urban residential neighborhood at night, he tucked the firearm into his waistband, concealing the weapon from view. We agree that openly carrying a firearm under unusual circumstances, which might include the time of day, neighborhood, manner of carry, and type of firearm, *see Spencer*, 876 P.2d at 949 nn.4–5, could constitute a violation of § 9.41.270(1). And as in *Mitchell*, the officers here could have stopped Willy to inquire further. The difference is Thaxton arrested Willy on the spot whereas the officers in *Mitchell* conducted a *Terry* stop and then discovered an independent ground for arrest.

gun or pointed it at anyone. In fact, "the caller told the 911 operator, 'He didn't threaten me. It's just that he showed me. I seen it. . . . Just calling to tell you, just calling to tell you.'" *Id.* The court held that the 911 call did not even "rais[e] a reasonable suspicion of criminal activity." *Id.*

Similarly, in *State v. Casad*, 139 Wash. App. 1032 (Wash. Ct. App. 2007), a 911 caller reported seeing a man walking down a public street with a rifle in a towel. When the police saw Casad, it was 2 p.m. in the afternoon, and he was walking with two rifles pointed downward and partially covered with a towel. Police stopped Casad, and he told them he did not have a car and was taking the rifles to a pawn shop. The rifles were unloaded. Casad had a felony record and was arrested for unlawful possession of a firearm. The Washington Superior Court held that police lacked grounds to conduct a *Terry* stop, and the Washington Court of Appeals affirmed the suppression of the evidence as fruit of an unlawful detention. The court of appeals held that Casad could not be stopped even to investigate potential violation of § 9.41.270. Given the time of day, the location, and the manner in which Casad was carrying the rifles, "[i]t [was] not unlawful for a person to responsibly walk down the street with a visible firearm, even if this action would shock some people." *Id.* at *5.

Our recent decision in a Washington case involving § 9.41.270 is consistent with these rulings. In *United States v. Brown*, 925 F.3d 1150 (9th Cir. 2019), we held that a report of a gun did not even constitute *reasonable suspicion* to stop Brown. Seattle police received a 911 call reporting that an unidentified person saw a young, black man with a gun. An officer spotted Brown, who matched the description, and "drove behind him for several blocks before turning on his

patrol lights and driving the wrong direction down a one-way street to follow Brown." *Id.* at 1152. When the officer turned on his lights and began following Brown, he ran. We held that the officers lacked reasonable suspicion even to stop Brown. *Id.* at 1153–56; *see id.* at 1154 ("The anonymous tip that Brown had a gun thus created at most a very weak inference that was unlawfully carrying the gun without a license, and certainly not enough to alone support a *Terry* stop."). We pointed to the fact that Washington is a "shall issue state" and that there was no evidence that Brown was carrying without a license. Nor was there anything in the manner in which Brown was carrying that would have implicated § 9.41.270: "No evidence shows that the resident was alarmed at the time she reported seeing the gun. There is no report that she yelled, screamed, ran, was upset, or otherwise acted as though she was distressed." *Id.* at 1154. Thus, "[c]onsidering . . . the presumptive legality of carrying a concealed firearm in Washington, the 'tip' alone did not create reasonable suspicion that Brown was engaged in any criminal activity." *Id.*[6]

The dissent dismisses these cases as involving "innocuous conduct." Dissenting Op. at 44. But part of the significance of those cases lies in the fact that the defendants were arrested by police and charged by prosecutors. Obviously those entities did not consider the defendants' conduct "innocuous." These cases are part of a dialogue between police and

---

[6] In contrast, we have consistently found reports that a defendant is carrying a concealed weapon sufficient to give rise to reasonable suspicion of potential illegal activity in California, where carrying a concealed firearm is presumptively a crime. *See e.g., Bontemps*, 977 F.3d at 914; *United States v. Vandergroen*, 964 F.3d 876, 881 (9th Cir. 2020); *Foster v. City of Indio*, 908 F.3d 1204, 1215 (9th Cir. 2018).

prosecutors on the one hand, and the courts on the other, to establish the boundaries for lawful and unlawful carrying and display of weapons. Moreover, in two of the cases, *Brown* and *Casad*, the courts concluded that not only did the police lack probable cause to arrest, they lacked reasonable suspicion to conduct a *Terry* stop. *See Brown*, 925 F.3d at 1154; *Casad*, 139 Wash. App. 1032 at *5.

The question for us, of course, is which side of the line drawn by the Washington courts does Willy's conduct fall on? We turn to that question.

B. *Applying These Principles to Willy*

Deputy Thaxton's suspicion that Willy had violated § 9.41.270 arose not from his own observations but from the accounts of two reporting parties. For our purposes, we will assume that the information was reliable, but we are confident the circumstances will bear out the assumption. *See Florida v. J.L.*, 529 U.S. 266, 270–74 (2000); *Vandergroen*, 964 F.3d at 879–80. The parties identified themselves, provided Deputy Thaxton with detailed reports, and provided consistent details of their very recent encounters with Willy. It was reasonable for an officer in Deputy Thaxton's position to rely on the information. *See Foster*, 908 F.3d at 1214.

The more difficult question is not whether Deputy Thaxton should have investigated further, but whether, on the basis of the two reports, he had probable cause to arrest Willy without further inquiry. If Thaxton had probable cause, it means he could have arrested Willy at his home or place of employment; it means he could have procured a warrant and then arrested Willy the following day or the following week. Although the reports Deputy Thaxton received were reliable,

under Washington law, they did not describe conduct that a reasonable officer would believe violated § 9.41.270.  We conclude that Deputy Thaxton did not have probable cause to arrest Willy for three reasons.

First, the district court's key factual findings were based on the in-court testimony of Deputy Thaxton.  The court found that both reporting parties indicated that Willy did not display the gun in a threatening manner and did not indicate that Willy threatened any individual, including his alleged kidnappers, or pointed the gun at anyone.  These findings are not "illogical, implausible, or without support in the record." *See United States v. Graf*, 610 F.3d 1148, 1157 (9th Cir. 2010).  Deputy Thaxton testified that he understood Willy's interactions with the reporting parties were not lengthy or "especially hostile," and that neither party indicated Willy was argumentative.  Both reporting parties told Deputy Thaxton that Willy had not pointed the gun at them or made any demands of them.  Willy appeared to only want any information the reporting parties might have about his alleged kidnapping, and when the parties indicated they knew nothing, Willy left "peacefully."  Deputy Thaxton testified that neither reporting party seemed to be "overly concerned," but that he inferred from the fact that they called police that "they were concerned enough that they did call in about it." Deputy Thaxton indicated that he interpreted Reporting Party 1's concern that Willy was "rambling on" as a worry that "something wasn't completely correct with [Willy]."  From that, Thaxton surmised—without direct statements from either of the reporting parties— that "[Willy] would possibly use [the gun] if confronted with somebody else" because "normal people just don't walk around displaying firearms out to people when they pull up."  At the same time, Deputy

Thaxton confirmed "[t]here was no direct threat with a firearm, to my knowledge."

The strongest fact for the government is that Willy racked the slide of his gun in the presence of Reporting Party 1. In context, however, that fact does not demonstrate that Willy was acting in manner that warrants alarm. Reporting Party 1 told Deputy Thaxton that Willy had "picked the firearm up, racked it, and then put it back down." Deputy Thaxton testified that it was his understanding that the gun was in the seat of Willy's truck, and Willy remained in his truck during his interactions with both reporting parties. On this record, it was not clearly erroneous for the district court to conclude that neither reporting party indicated to Deputy Thaxton that Willy displayed his firearm in a threatening manner.

The dissent takes the district court's statement—that "Deputy Thaxton had a particularized and objective basis for suspecting that Willy 'was either armed and delusional or armed and seeking to possibly avenge his alleged kidnaping and abduction'"—out of context. Dissenting Op. at 32, 45. The discussion preceding and following this sentence supports our view. The district court stated:

> In the Court's mind, Deputy Thaxton had reasonable suspicion to conduct a *Terry* stop. After speaking with the reporting persons, he learned that Defendant was armed and was trying to find the place where he had been kidnapped and abducted. These facts provided Deputy Thaxton with a "particularized and objective basis" for suspecting that Defendant was either armed and delusional or armed and seeking to

possibly avenge his alleged kidnapping and abduction. Thus, Deputy Thaxton could have briefly detained Defendant and asked him questions about the two incidents in question.

The district court found a sufficient factual basis for a reasonable officer to *suspect* that Willy might be either delusional or seeking to avenge his kidnapping. However, the court did not "posit[]" that those were the only possible scenarios or that suspicion that Willy might commit a crime in the future bears on whether he violated § 9.41.270 in his interactions with the reporting parties. *See* Dissenting Op. at 45. Rather, the district court found, and we agree, that Deputy Thaxton had reasonable suspicion to detain Willy to inquire further whether his unusual interactions with the reporting parties amounted to a criminal violation or were an indication that he was about to commit a crime.

Second, § 9.41.270(1) requires more than the mere display of a firearm, and at the time Deputy Thaxton located Willy, he did not have sufficient information to reasonably believe that Willy had displayed his gun in a manner that warrants alarm. Willy's conduct differs from violations of § 9.41.270 that have been upheld by the Washington courts such that a reasonable officer would have needed additional information before believing a violation of the statute had occurred. The type of weapon—a semi-automatic pistol—is the type of weapon a person might keep in their car or on their person for self-defense. Willy was in what Deputy Thaxton described as a "rural community," where firearms were common. And, as the district court found, Willy did not point the gun at anyone or manifest an intent to harm anyone. Indeed, Willy told both reporting parties what he was looking for—a trailer—and introduced himself by name to Reporting

Party 2. Although Willy's conduct, including his fantastical account of his kidnapping, was strange and might have warranted further investigation, in Washington, where it is presumptively lawful to possess a firearm, it did not warrant his immediate arrest.[7]

Although the government is correct that the reports here indicated that Willy displayed the firearm rather than just carrying it, this distinction does not create enough of a possibility of criminal activity that Willy was subject to immediate arrest without further investigation. In a state in which carrying a firearm openly is lawful, there is very little room between "carrying" a firearm and "displaying" it. We read the Washington cases as "narrowly construing the phrase to apply to only conduct that poses a threat to others" as a means of "giv[ing] the phrase a narrow and definite focus and sav[ing] it from vagueness." *Maciolek*, 676 P.2d at 1001 n.3. The threat must follow from "objective circumstances [that]

---

[7] We agree with the dissent that Willy's conduct does not fit neatly into either category of cases, those with clearly threatening conduct, like *Baggett* and *Glenn*, or those with lawful conduct, like *Brown*, *Cardenas-Muratalla*, or *Casad*. Dissenting Op. at 44–45. But we respectfully disagree with the dissent's suggestion that what separates Willy's case from those in which there was neither a manifestation of intent to intimidate or conduct that warranted alarm is "the concern that Willy was mentally ill or experiencing some sort of psychological disturbance." Dissenting Op. at 45. Section 9.41.270 was not designed as a mechanism for dealing with people who have a mental disorder or who are experiencing a mental health crisis. Washington has extensive procedures for identifying and detaining persons with behavioral health disorders who "present[] a likelihood of serious harm," *see* Wash. Rev. Code §§ 71.05.150, .153; *see generally* Wash. Rev. Code ch. 71.05, including a six-month suspension of the right to possess a firearm for anyone detained for evaluation and treatment on the grounds that they present a likelihood of serious harm, Wash. Rev. Code § 71.05.128.

would warrant alarm in a reasonable person." *Spencer*, 876 P.2d at 942 (footnote omitted). If the circumstances in *Cardenas-Muratalla*, *Casad*, and in our decision in *Brown* do not add up to reasonable suspicion, we are hard pressed to conclude that the 911 calls here add up to probable cause to arrest.

Finally, the government argues that the district court erred in its interpretation of state law by effectively requiring the presence of subjective harm for a violation of § 9.41.270(1). Although the district court found that neither of the reporting parties "manifested any physical characteristics associated with 'alarm,'" it did not misapply the requirements of § 9.41.270(1). The district court accurately stated that § 9.41.270(1) both incorporates a reasonable person standard and does not require that a person's actions actively cause alarm. The reporting parties' accounts of what happened and their demeanor as they did so were "facts and circumstances within [Deputy Thaxton's] knowledge," and directly relevant to whether Deputy Thaxton had probable cause to arrest Willy. *Valencia*, 24 F.3d at 1108. The district court properly considered the reporting parties' descriptions of their encounters with Willy, explaining that "[b]oth [witnesses] indicated that Defendant did not display the gun in a threatening manner" and "neither one indicated that Defendant was threatening any other persons, including his alleged kidnappers." We find no error in the district court's mention of the subjective reactions of the reporting parties, as the court properly weighed whether Willy's conduct, as relayed to Deputy Thaxton, would warrant alarm in a

reasonable person.[8] *See Spencer*, 876 P.2d at 944 (stating that the court's conclusion that the defendant's conduct warranted alarm was supported by the actual alarm induced in several witnesses).

The dissent makes much of the fear that whether or not Willy was truly abducted, he would seek to harm either his actual captors or innocent strangers he perceived to be part of his "imagined abduction." Dissenting Op. at 45. But Deputy Thaxton did not purport to arrest Willy because he believed Willy was about to commit a battery or other violent crime against his alleged kidnappers, nor does the government advance such an argument. Deputy Thaxton arrested Willy because of what Willy had already done. Thaxton testified that at the time he arrested Willy, Willy had already violated § 9.41.270(1) in his interactions with Reporting Parties 1 and 2.

Section 9.41.270 criminalizes the act of displaying a firearm in a manner that warrants alarm, not displaying a firearm reasonably but creating a separate impression that you might seek to harm persons not present at some unspecified future time. We are not asked to decide whether *Willy* "warrant[ed] alarm for the safety of others," we must

---

[8] The government argues that the district court's statement during the hearing that, if he were in Reporting Party 1's shoes, he "would be very intimidated" contradicts the eventual finding that a reasonable person would not have been alarmed. We disagree. First, the district court's written decision supercedes any statements during the hearing. *See White v. Wash. Pub. Power Supply Sys.*, 692 F.2d 1286, 1289 n.1 (9th Cir. 1982) ("[T]he rule in this circuit is that the formal findings of fact and conclusions of law supersede the oral decision."). And second, the district court prefaced its statement with " I know [this is] not really the standard the Court needs to look at, but just bear with me for this example."

ask only whether a reasonable officer would believe that Willy *displayed his firearm* "in a manner, under circumstances, and at a time and place that . . . warrants alarm for the safety of other persons." More information was required to answer that question.

We do not take lightly Deputy Thaxton's concern that Willy could have been a danger to himself or others and that he did not want to "place [him]self in possible jeopardy" by approaching Willy's vehicle to gather more information. In these circumstances, we fully respect that Deputy Thaxton had reasonable suspicion to stop Willy and make further inquiries. But Deputy Thaxton had a range of options short of arrest for inquiring whether Willy had violated or was about to violate § 9.41.270 or another criminal statute. Deputy Thaxton could have stopped Willy's vehicle, *see United States v. Chaudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006), ordered Willy out of the vehicle, *see Arizona v. Johnson*, 555 U.S. 323, 331–32 (2009), drawn his own weapon, *see Allen v. City of Los Angeles*, 66 F.3d 1052, 1056–57 (9th Cir. 1995), patted Willy down for weapons, *see United States v. Terry-Crespo*, 356 F.3d 1170, 1173–77 (9th Cir. 2004), and even handcuffed Willy during the detention if he felt it was necessary for his safety, *see United States v. Edwards*, 761 F.3d 977, 981–82 (9th Cir. 2014). We thus agree with the dissent that Thaxton "could not afford to ignore [the surrounding] context, in the interest of his own safety, Willy's safety, and the safety of anyone else in the vicinity." Dissenting Op. at 49. But that just emphasizes why Thaxton should have conducted a *Terry* stop to see whether Willy posed a potential threat to Willy's own safety, Thaxton's safety, or the safety of others. Instead, Thaxton decided that Willy had already posed such a threat to Reporting Parties 1 and 2. That judgment is not supported by

the record. We conclude that Deputy Thaxton could not, consistent with Washington law and the Fourth Amendment, arrest Willy on the spot without further inquiry into whether a violation of § 9.41.270 had taken or was about to take place.

## C. *Exclusionary Rule*

Under the "fruits of the poisonous tree" doctrine, evidence seized subsequent to a violation of the Fourth Amendment is tainted by the illegality and subject to exclusion, unless it has been sufficiently "purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 485–88 (1963). The district court held that all evidence obtained and statements made after the illegal arrest were subject to exclusion. The government has not challenged the application of the "fruit of the poisonous tree" doctrine to the two firearms, $CO_2$ cartridge, or Willy's statement. Thus, we affirm the district court's application of the exclusionary rule to suppress Willy's statements, the altered handgun, short-barrel shotgun, and $CO_2$ device as the fruits of the illegal arrest. *See United States v. Washington*, 490 F.3d 765, 774–77 (9th Cir. 2007); *United States v. Patzer*, 277 F.3d 1080, 1084–85 (9th Cir. 2002); *United States v. Shephard*, 21 F.3d 933, 938–40 (9th Cir. 1994).

## IV. CONCLUSION

We affirm the district court's order granting the defendant's motion to suppress.

**AFFIRMED.**

CHRISTEN, Circuit Judge, dissenting:

The only question our court needs to decide is whether Deputy Thaxton had probable cause to suspect that Willy violated the second clause in RCW 9.41.270(1) by displaying a firearm "in a manner, under circumstances, and at a time and place that . . . warrants alarm for the safety of other persons." Without question he did, and Deputy Thaxton lawfully arrested him.

Two concerned citizens called their local sheriff's office on May 12, 2019 to report their separate encounters with Willy, who had approached both of them near their respective residences that evening to ask for their help in locating the place where he had been held against his will by unidentified abductors. Willy was a stranger to the callers, and his bizarre tale and behavior motivated both of them to contact the sheriff's office. He professed to be driving around looking for the place where he had been held captive for several days near a camouflaged trailer and van. Willy told Reporting Party 1 that the police had refused to help him and he made clear that he had armed himself and was searching for the camouflaged trailer and van on his own. In the course of explaining to the first caller that he was looking for the place where the alleged kidnappers held him captive, Willy picked up a firearm, racked the slide, and then set it back down at his side. Willy told the same story, and again displayed his semi-automatic firearm, when he stopped to talk to the second caller. The district court conducted an evidentiary hearing and found that Deputy Thaxton had a particularized and objective basis for suspecting that Willy "was either armed and delusional or armed and seeking to possibly avenge his alleged kidnapping and abduction."

Washington criminalizes displaying a firearm under circumstances that *either*: (1) manifest an intent to intimidate another; *or* (2) *warrant alarm for the safety of other persons*. *See* RCW 9.41.270(1). It is the statute's second clause that is at issue here. RCW 9.41.270(1) requires us to consider the manner, circumstances, and time and place in which the weapon was displayed. I see no room for debate about whether Willy's conduct objectively warranted alarm for the safety of others. It is uncontested that Willy *displayed* a firearm to both callers, i.e., the majority agrees he displayed it and was not simply carrying it. Majority Op. 5–6. And the surrounding circumstances support the district court's finding that Deputy Thaxton had a particularized and objective basis for suspecting that Willy "was either armed and delusional, or armed and seeking to possibly avenge his alleged kidnapping and abduction." No one argues that the court's findings of historical fact were clearly erroneous. On this record, Willy's separate violations of RCW 9.41.270(1) were complete when he drove away from the encounters with Reporting Party 1 and Reporting Party 2 (collectively, "the reporting witnesses").

Deputy Thaxton had probable cause to arrest Willy for violating the second clause of RCW 9.41.270(1), even though Willy's actions occurred outside Deputy Thaxton's presence, because the reliability of the callers' reports was verified when the details they provided checked out: both reporting witnesses described the same green truck and said they were approached by a man who told the same extraordinary story, and the green truck's license plate number correlated to a photograph of the registered owner that one of the callers positively identified as the person who had approached her in her driveway. Deputy Thaxton spotted the green truck with a matching license plate number that same evening,

approached it, and directed the driver (Willy) to exit but keep his hands visible. In doing so, Deputy Thaxton effectuated an arrest in a way that minimized the risk to Willy and to others. It was Deputy Thaxton's perilous duty to arrest Willy, a man he had good reason to believe to be armed and mentally compromised, for displaying a firearm "in a manner, under circumstances, and at a time and place, that . . . warrants alarm for the safety of other persons." *See* RCW 9.41.270(1). The majority affirms the district court's order granting Willy's motion to suppress. Because probable cause so clearly justified his arrest, I respectfully dissent.

## I.

On the night of May 12, 2019 at approximately 8:37 p.m., the Yakima County Sheriff's Office received a call from Reporting Party 1 that a stranger driving a green Chevrolet truck had pulled over to speak with him outside of his home. Reporting Party 1 stated that the driver displayed a firearm and began "rambling on and not making sense about being previously abducted in this area and was looking for the place" where he had been held. As the driver of the green truck recounted his bizarre tale, he picked up a black semi-automatic gun and racked the slide before returning it to rest on the passenger seat of the truck. Reporting Party 1 then contacted the Yakima County Sheriff's Office and relayed the truck's licence plate number to dispatch. When Deputy Thaxton responded about twenty minutes later, he showed Reporting Party 1 a photo of Willy, the vehicle's registered owner. Reporting Party 1 "looked at it and immediately said, yeah, that's the guy that was in the truck." As the majority recognizes, Reporting Party 1 "expressed concern about [Willy's] mental state." Majority Op. 5.

About ten minutes after meeting with this first witness, Deputy Thaxton responded to a call from a second, unrelated witness reporting a similar encounter about three miles away. This caller said that a man in a green truck waved her down as she was pulling out of her driveway. Reporting Party 2 had never met this man before but she recalled that he introduced himself using a name that was something like "Willis." The man told Reporting Party 2 the same story about being kidnapped and held in a camouflaged trailer and van. Like Reporting Party 1, Reporting Party 2 did not feel personally threatened, but Reporting Party 2 was clear that the man told her he was armed. Willy remained in his truck as he talked to the reporting witnesses, but he displayed a black gun and declared his intention to find the location where he had been held. The man drove off when Reporting Party 2 told him she could not help him find the camouflaged trailer and van.

After following up with both reporting witnesses, Deputy Thaxton located the green Chevrolet truck as it turned into a gas station later that night. The deputy activated his emergency lights, pulled his vehicle behind the truck, and conducted a "high-risk stop" by drawing his firearm and ordering the truck driver to exit and keep his hands visible. Willy complied and Deputy Thaxton ordered him to turn 360 degrees. As Willy was turning around, Deputy Thaxton observed a black semi-automatic pistol holstered on Willy's right hip. Thaxton then directed Willy to place his hands above his head, approached him and removed the pistol from its holster, and seated Willy in the backseat of his patrol car. Thaxton noticed that the serial number had been filed off the black pistol and he read Willy *Miranda* warnings. Willy agreed to speak with the deputy and he told the same story about being kidnapped and held for several days at a location

with a camouflaged trailer and van.  He also said that he eventually escaped his captors and reported that the police had done nothing about his abduction.  Willy consented to a search of his truck, and Deputy Thaxton retrieved a sawed-off shotgun from the right rear floor bed.

At the Yakima County jail, Willy was searched with a metal detector wand.  A modified $CO_2$ cartridge was discovered concealed in the groin area of Willy's pants, along with pellets, gunpowder, and a fuse.  Willy explained that these items comprised a non-functioning pipe bomb.

## II.

Deputy Thaxton initially stopped Willy for unlawfully displaying the semi-automatic pistol during his encounters with the two witnesses, and the State of Washington ultimately charged Willy with violating its statute prohibiting the unlawful display of a firearm. *See* RCW 9.41.270(1).  A federal grand jury in the Eastern District of Washington returned a three count indictment against Willy for receiving and possessing an improvised explosive device, in violation of 26 U.S.C. § 5861(c); receiving and possessing an improvised explosive device that was not registered to him, in violation of 26 U.S.C. § 5861(d); and making an improvised explosive device, in violation of 26 U.S.C. § 5861(f).

Willy argued that Deputy Thaxton lacked probable cause to arrest him, and he moved to suppress the semi-automatic pistol, shotgun, pipe bomb, and the statements made after his arrest.  The district court granted his motion.  The court concluded that Willy was under arrest as soon as Deputy Thaxton ordered him to exit his truck because the deputy

approached Willy's truck with his firearm drawn and ordered Willy to exit the vehicle. In granting Willy's motion to suppress, the district court concluded that Deputy Thaxton had reasonable suspicion to conduct an investigative stop, but not probable cause to effectuate an arrest without probing more fully the circumstances surrounding Willy's interactions with the two reporting witnesses who had called the sheriff's office. The district court ruled that the challenged evidence was the fruit of an illegal arrest and suppressed the evidence pursuant to the exclusionary rule.[1]

In the district court and on appeal, the government relied on its position that Willy's arrest was lawful because it was supported by probable cause. The government did not rely on the good faith exception,[2] the inevitable discovery exception,[3] or the admonition that the exclusionary rule is intended to deter Fourth Amendment violations and should be applied as "our last resort, not our first impulse . . . applicable only . . .

---

[1] Willy separately argues that his arrest violated the Fourth Amendment because Washington law prohibits officers from arresting suspects for misdemeanors committed outside their presence. *See* Wash. Rev. Code. § 10.31.100. This argument is foreclosed by our precedent. *See Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990) ("The requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment."); *see also Alford v. Haner*, 446 F.3d 935, 937 n.2 (9th Cir. 2006) (citing *Barry* and holding that an arrest in violation of a Washington statute prohibiting arrests for misdemeanors committed outside officer's presence did not run afoul of the Fourth Amendment).

[2] *See, e.g.*, *Davis v. United States*, 564 U.S. 229, 238–40 (2011).

[3] *See, e.g.*, *Nix v. Williams*, 467 U.S. 431, 444 (1984).

where its deterrence benefits outweigh its substantial social costs."**[4]**

## III.

Determinations of reasonable suspicion and probable cause are generally reviewed de novo, and the Supreme Court has cautioned that reviewing courts "should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."**[5]**  Here, the district court's findings of historical fact are not disputed. The sticking point is whether the established facts amounted to probable cause to suspect that Willy had violated RCW 9.41.270, Washington's law prohibiting displaying a firearm with intent to intimidate or in a manner that warrants alarm.

To decide whether Deputy Thaxton had probable cause to arrest Willy, "we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to 'probable cause.'"**[6]**  Our review is de novo because the question here is one of law, not fact, and we are in as

---

**[4]** *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (citations and internal quotation marks omitted); *see United States v. Dreyer*, 804 F.3d 1266, 1278 (9th Cir. 2015) (en banc).

**[5]** *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

**[6]** *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (citation and internal quotation marks omitted).

good a position as the district court to make this determination independently.[7]

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested."[8] This "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."[9] The Supreme Court has repeatedly made clear that probable cause "is not a high bar: It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act."[10]

Deputy Thaxton had probable cause to arrest Willy because two concerned citizens separately called the police dispatcher to report that Willy, a stranger to both of them, was driving around at approximately 8:30 in the evening looking for a camouflaged trailer and van where he claimed to have been abducted and kept for several days. Willy's

---

[7] *See Ornelas*, 517 U.S. at 697 (citing *Miller v. Fenton*, 474 U.S. 104, 114, (1985)); *see also United States v. Johnson*, 903 F.2d 1219, 1221 (9th Cir. 1990) ("The district court's finding of historical facts is reviewed under the clearly erroneous standard, but the ultimate determination of whether those facts amount to an unlawful seizure is a matter of law that we review *de novo*.").

[8] *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

[9] *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).

[10] *Kaley v. United States*, 571 U.S. 320, 338 (2014) (citations and internal quotation marks omitted).

conduct warranted alarm for the safety of others because he went out of his way to display his semi-automatic pistol to both witnesses as he explained the reason he was out searching for the camouflaged trailer and van.  He does not contest that the Reporting Witness 1 described him as "rambling," that he repeatedly claimed to have escaped from kidnappers, that he complained the police had not done anything to help him, that he picked up a black semi-automatic pistol from the seat of his truck while talking to both local residents, nor that he racked the gun's slide while he was explaining to Reporting Party 1 that he was looking for the location where he had been held for several days against his will.  Though the reporting witnesses expressed concern about Willy's mental state, the majority nevertheless concludes that the historical facts do not amount to probable cause to suspect that Willy had displayed a firearm *in a manner, under circumstances, and at a time and place that warranted alarm for the safety of other persons*.  *See* RCW 9.41.270(1).  I strongly disagree.

**IV.**

It is presumptively lawful to openly carry a firearm in Washington, *United States v. Brown*, 925 F.3d 1150, 1154 (9th Cir. 2019), but RCW 9.41.270 declares it a gross misdemeanor to "carry, exhibit, display, or draw any firearm . . . *in a manner, under circumstances, and at a time and place* that *either* manifests an intent to intimidate another *or that warrants alarm for the safety of other persons*."  RCW 9.41.270(1) (emphasis added).  The majority agrees that Willy displayed a firearm to the witnesses, i.e., the majority agrees he was not merely carrying one, but the majority concludes that the manner, circumstances, and time and place did not warrant alarm for the safety of other persons.

The meaning of the phrase "warrants alarm for the safety of other persons" in RCW 9.41.270(1) is central to this appeal, but whether the concerned citizens who called the sheriff's office subjectively felt threatened is not. The second statutory clause is at issue, not the first, and Washington case law is clear that the objective "reasonable person" standard applies. *See State v. Spencer*, 876 P.2d 939, 942–43 (Wash. Ct. App. 1994). Accordingly, neither Willy's intent, nor the subjective responses of the first two callers, dictates the outcome of Willy's motion to suppress:

> The unlawful display statute recognizes that display of a weapon, *without any required intent*, could be done in a manner to cause reasonable apprehension, fear, or alarm. There is no necessary nexus between reasonable apprehension and the defendant's actual intent. Under some circumstances, apprehension could be reasonable at the mere sight of a firearm, while the defendant's intent could be completely innocent.

*State v. Byrd*, 868 P.2d 158, 162 (Wash. Ct. App. 1994), *aff'd*, 887 P.2d 396 (Wash. 1995) (emphasis added). "The statute only requires that the circumstances [w]arrant alarm for the safety of others. They need not actively [c]ause such alarm." *State v. Workman*, 584 P.2d 382, 386 (Wash. 1978).

The majority reviews Washington case law, but comes up short in finding support for its conclusion that Deputy Thaxton lacked probable cause to arrest Willy for violating Washington's unlawful display statute. In *State v. Maciolek*, 676 P.2d 996 (Wash. 1984) and *Spencer*, 876 P.2d 939, Washington courts considered and rejected void for

vagueness challenges to the statute. In the majority's words, the two cases together yield only the rule that a defendant's "act must warrant alarm in a reasonable person for the safety of others." Majority Op. 16.

Citing *Maciolek*, 676 P.2d at 999, the majority suggests it is incorrect to view the two clauses of RCW 9.41.270(1) separately. Majority Op. 16–17. *Maciolek* rejected the challenger's vagueness argument by reasoning that the specific list of weapons in the first clause calls for a narrow construction of the second clause "to apply to only conduct that poses a threat to others." *See Maciolek*, 676 P.2d at 999–1001. The court decided that persons of common intelligence would not have to guess at the meaning of the statute, *id.* at 999, and nothing in *Maciolek* suggests that RCW 9.41.270(1)'s two clauses must be read as one. In fact, in *State v. Baggett*, another decision cited by the majority and decided sixteen years after *Maciolek*, the Washington appellate court affirmed the defendant's conviction for "violat[ing] the second portion of RCW 9.41.270(1)." 13 P.3d 659, 660 (Wash. Ct. App. 2000); *see State v. M.T.*, 97 Wash. App. 1067, at *3 (1999) (noting that "the final element of this statute is stated in the disjunctive: the action must either manifest an intent to intimidate another or it must warrant alarm").

The majority concludes that RCW 9.41.270 is "best read as capturing the scenarios where someone is not directly threatening a person who is present, but is handling their firearm in such a way that it presents a danger to others." Majority Op. 17. This is wrong for two reasons.

First, we cannot re-write RCW 9.41.270(1). The Washington legislature criminalized conduct that *warrants*

*alarm* for the safety of others—not conduct that "presents a danger" to others. Because Willy's words and conduct were a thinly veiled threat of actions he would take if he located his alleged abductors, it plainly warranted alarm for their safety.

Second, the majority's interpretation of the statute cannot be squared with *State v. Mitchell*, 906 P.2d 1013 (Wash. Ct. App. 1995), a decision the majority cites with approval. Majority Op. 19. In that case, the Washington court decided that an officer had reasonable suspicion to stop Mitchell for violating RCW 9.41.270 when he personally observed Mitchell carrying a semi-automatic weapon in an urban, residential area at night. *Mitchell*, 906 P.2d 1013. Mitchell tucked the gun in his waistband when the officer passed him. Contrary to the majority's interpretation of RCW 9.41.270(1), Mitchell was "not directly threatening a person who [was] present," and there is no indication that he was handling his "firearm in such a way that it presents a danger to others" when the officer stopped him. *See id.* at 1014–15. The court emphasized the "warrants alarm for the safety of other persons" portion of RCW 9.41.270(1), and held that "openly carrying a semi-automatic weapon while walking down a street in an urban, residential area at night" was sufficient to warrant reasonable suspicion that this statute was being violated. *Id.* at 1016.

Like Mitchell, Willy displayed a semi-automatic firearm in residential areas at night. Unlike Mitchell, Willy also racked the slide of his firearm, appeared mentally unstable, and made it known that he was actively searching for other persons he believed to be his abductors. The statute's plain text shows the Washington's legislature criminalized conduct that *either* manifests an intent to intimidate another *or* that warrants alarm for the safety of other persons. Willy's

combined actions, words, and gestures fall squarely within *Maciolek*'s construction of RCW 9.41.270(1)'s core because the manner and circumstances in which he displayed his firearm "pose[d] a threat to others" and objectively "warrant[ed] alarm" for their safety. *See* RCW 9.41.270(1); *Maciolek*, 676 P.2d at 1001 n.3.

The other Washington cases surveyed by the majority can be divided into two categories. The first category includes cases in which the defendants displayed very obviously threatening conduct. For example, the defendant in *Baggett* pointed a rifle at a police officer and was charged with second degree assault but convicted of RCW 9.41.270 as a lesser included offense. 13 P.3d 659. *State v. Glenn* involved a legitimate citizen report that a driver had pointed a gun at a child from a vehicle—justifying the belief that the defendant's suspected misconduct endangered the safety of the officers. 166 P.3d 1235 (Wash. Ct. App. 2007).

The second category of cases includes those in which defendants simply carried firearms openly, as the law in Washington permits, and the surrounding circumstances neither "manifest[ed] an intent to intimidate another," in violation of RCW 9.41.270(1)'s first clause, nor "warrant[ed] alarm for the safety of other persons," in violation of the statute's second clause. The majority cites *Brown*, 925 F.3d 1150, Majority Op. 12, 21–22, 28, but that decision is a prime example of a case that does not aid the majority's cause because it falls into the second category of cases involving innocuous conduct. Our court had no trouble reversing the district court's denial of Brown's motion to suppress because the circumstances in that case were entirely mundane, and gave no reason for alarm for anyone's safety. *See Brown*, 925 F.3d at 1154. The police acted on an unverified tip that

Brown, an African American man, was simply walking on a street in downtown Seattle and "had a gun." *Id.* at 1152–54. We reasoned: "With no reliable tip, no reported criminal activity, no threat of harm, no suggestion that the area was known for high crime or narcotics, no command to stop, and no requirement to even speak with the police," the officers did not have reasonable suspicion to stop Brown. *Id.* at 1151–52.

The circumstances in Willy's case were vastly different because the reports called in to dispatch gave rise to the concern that Willy was mentally ill or experiencing some sort of psychological disturbance. Deputy Thaxton had reports describing Willy as "rambling on" about being abducted, and he very reasonably understood from the callers' reports that "something wasn't completely correct with [Willy]." On this record, the district court was persuaded that Deputy Thaxton had a particularized and objective basis for suspecting that Willy "was either armed and delusional or armed and seeking to possibly avenge his alleged kidnapping and abduction."

*Both* scenarios posited by the district court objectively warranted alarm for the safety of others. If Willy was armed and experiencing delusional thinking, it was reasonable to be concerned that he might falsely believe that innocent strangers had been complicit in his imagined abduction, and equally reasonable to expect that he would engage in violent self-help because he was under the impression that the police had failed him. On the other hand, if Willy had actually escaped from a kidnapping, believed the police were unwilling or unable to help him, and was seeking out the location where he had been held against his will, any reasonable person would similarly be alarmed for the safety of those who he thought had kidnapped him and fearful for

the consequences if Willy managed to find his captors—or anyone in a camouflaged trailer and van—that he believed to be the one where he had been held.

In short, regardless of whether he had actually been kidnapped, the credible reports of the actions Willy took to show the reporting witnesses his semi-automatic pistol and to rack its slide as he described his abduction were either threatening gestures themselves, or intended to convey the message to the reporting witnesses that the weapon was loaded and ready for use once he located the camouflaged trailer and van.[11] These circumstances easily support Deputy Thaxton's conclusion that Willy had violated RCW 9.41.270 by the time he left the reporting witnesses, i.e., Willy's actions and words objectively gave rise to concern for the safety of others.

Willy and the majority make much of the fact that the witnesses indicated they did not feel personally threatened, but the statute's text and Washington case law are in accord that the callers need not have felt subjectively threatened in order for Willy's conduct to objectively "warrant[] alarm for the safety of other persons." *See* RCW 9.41.270(1); *Workman*, 584 P.2d at 385–86. The statute is judged from an

---

[11] *See generally What Should America Do About Gun Violence?: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2013) (written testimony of David B. Kopel, Research Director, Independence Institute) (citation omitted), *available at* https://www.judiciary.senate.gov/imo/media/doc/1-30-13KopelTestimo ny.pdf ("If the final round from the last magazine has been fired, the first round from the new magazine must be chambered before the gun will fire. Chambering a round involves 'racking' the gun by manually operating the gun's slide mechanism, a process that typically takes fractions of a second.").

objective, reasonable person standard, but Washington courts sometimes consider witness perceptions to decide whether a defendant's actions gave objective cause for alarm. *See, e.g.*, *Spencer*, 876 P.2d at 944 ("[O]ur conclusion that [the defendant's] conduct warranted alarm is supported by the kinds of people who were alarmed in this case, including several firefighters, a police officer, and a passing motorist.").

In Willy's case, the district court notably expressed that even it would have been alarmed by Willy's actions: "If I was Reporting Party No. 1 and a person showed up and spoke like this and showed me his gun and racked it, I would be very intimidated." Although the court acknowledged "that's not really the standard the Court needs to look at," in the words of the Washington Supreme Court, the "conclusion that [Willy's] conduct warranted alarm is supported by the kinds of people who were alarmed in this case," *see id.*, i.e., a federal district court judge and a deputy sheriff. The district court's own reaction was strong support for the conclusion that Willy's actions objectively warranted alarm.

Willy's violations of RCW 9.41.270 were committed outside Deputy Thaxton's presence, but this does not change the fact that Deputy Thaxton had probable cause to arrest Willy, because the reports he received from dispatch were consistent and strongly corroborated when Deputy Thaxton followed up with the reporting witnesses. Both of the reporting witnesses who contacted the Yakima County's Sheriff's Office reported being approached by Willy and they described the same troubling behavior, bizarre story, and rambling countenance.

Though the reporting witnesses were separated temporally and geographically, both described the same stranger in a

green truck driving up to their homes after 8:30 p.m. Both expressed concern for Willy's mental state. Both described his story about being kidnapped, held for several days, and escaping. Both said that he was looking for the camouflaged trailer and van where he had been held, that he complained the police did nothing to help him, and that he gratuitously picked up a gun in the course of telling his story. The first caller described Willy racking the gun while explaining that he was looking for his abductors. The truck's license plate correlated to a photo of the registered owner that the first caller readily identified, and neither witness asked to remain anonymous. These reports had all of the indicia of "veracity," "reliability," and the solid "basis of knowledge" that the Supreme Court has instructed "are all highly relevant in determining the value of [a witness's] report . . . . [and] that may usefully illuminate the commonsense, practical question whether there is probable cause." *See Gates*, 462 U.S. at 230. It was not necessary for Deputy Thaxton to obtain additional corroborating information to establish probable cause. Common sense answered that practical question and, as our nation has learned after enduring a tragic number of shootings perpetrated by mentally ill assailants, delay may have turned a dangerous situation into a deadly one.

Despite its acknowledgment that Willy displayed his firearm to the reporting witnesses, the majority decides "it was not clearly erroneous for the district court to conclude that neither reporting party indicated to Deputy Thaxton that Willy displayed his firearm in a threatening manner." Majority Op. 25. But this answers the wrong question. The second clause of RCW 9.41.270(1) requires that we ask whether Willy's actions objectively warranted alarm for the safety of others. We must consider the surrounding

circumstances when we answer that question. *See* RCW 9.41.270(1); *Spencer*, 876 P.2d at 942 n.4. The majority never grapples with the fact that Deputy Thaxton had good reason to fear that Willy was mentally ill, and the significance of that fact cannot be overstated. The majority decides that Willy's chilling act of racking the gun while looking for the spot where likely imaginary abductors had held him captive is "[t]he strongest fact for the government," but it considers that fact in isolation and pivots, in its very next breath, to the conclusion that the first clause of the statute was not violated: "In context, . . . that fact does not demonstrate that Willy was acting in a manner that warrants alarm." Majority Op. 25.

But the surrounding context is *precisely* what established that Willy violated the second clause of the statute because the circumstances included compelling reasons to be concerned for the safety of others. Deputy Thaxton could not afford to ignore that context, in the interest of his own safety, Willy's safety, and the safety of anyone else in the vicinity. Our court should not ignore that context either, because RCW 9.41.270(1) dictates that the manner, circumstances, and time and place must be considered. Here, Willy's manner of displaying a firearm included recitation of a fantastical and rambling tale of abduction. The time and place in which he displayed it was during his nighttime search for the location of the camouflage trailer and van in a residential area. Willy's approach of the reporting witnesses at their homes, his insistence that the police had not helped him, and the fact that he had armed himself to search for his abductors on his own must also be considered.

Respectfully, under these circumstances the court is remiss in failing to recognize that Willy's very peculiar conduct objectively warranted alarm for the safety of others.

The majority's 20/20 hindsight observation that the deputy had a "range of options short of arrest," Majority Op. 30, or that he might have opted to take the time necessary to explore the possibility of obtaining a mental health commitment, *see* Majority Op. 27 n.7, might make sense when applied to a person who had merely displayed a firearm while stopping to chat or to ask for directions.   But given the overall circumstances relayed in the callers' verified reports, Deputy Thaxton did not have a duty to put his own safety at even greater risk by frisking Willy rather than conducting a high risk stop and arresting him. *See generally Terry v. Ohio*, 392 U.S. 1, 23 (1968) ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."); *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996) ("[T]hose who serve the public by taking on the dangerous job of enforcing the criminal laws are not required by the Fourth Amendment to take unreasonable risks.").   In the end, the majority concedes that "we must ask only whether a reasonable officer would believe that Willy *displayed his firearm* 'in a manner, under circumstances, and at a time and place that . . . warrants alarm for the safety of other persons.'"   Majority Op. 29–30. Deputy Thaxton needed no more information to answer that question, and he was free to arrest Willy.

Because Deputy Thaxton plainly had probable cause to believe that Willy had violated RCW 9.41.270 before approaching him at the gas station, the district court erred.  I would reverse the district court's order granting Willy's motion to suppress.